63 A.3d 692

**Donald S. DOBKIN**

v.

**The UNIVERSITY OF BALTIMORE SCHOOL OF LAW.**

**No. 2603, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

March 22, 2013.

---

**584**

Stephen T. Fieweger, (Katz, Huntoon & Fieweger, PC, Moline, Illinois, Lynne Bernabei, Alan R. Kabat, Bernabei & Wachtel, PLLC, Washington, D.C.), on the brief, for Appellant.

Katherine B. Bainbridge, (Douglas F. Gansler, Attorney General, on the brief) Baltimore, MD, for Appellee.

Panel: ZARNOCH, HOTTEN, and JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

HOTTEN, J.

Appellant, Donald Dobkin ("Mr.Dobkin"), filed a complaint in the Circuit Court for Baltimore City against appellee, the University of Baltimore School of Law ("U.B."), alleging that U.B. failed to hire him as an immigration law professor when he was fifty-six years of age, due to age discrimination,[1] in violation of the Md.Code (1984, 2009 Repl.Vol., 2012 Supp.), § 20-606(a) of the State Government Article.[2] He alleged

---

1. Appellant also filed a charge of gender discrimination. However, he has limited his appeal to the issue of age discrimination.

2. Md.Code (1984, 2009 Repl.Vol., 2012 Supp.), § 20-606(a) of the State Government Article provides:

> (a) *Employers.*—An employer may not:
> (1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of:
> (i) the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, genetic information, or disability

that U.B. hired a thirty-two year old woman, who was less experienced and qualified for the position. U.B. averred that the successful applicant[3] possessed qualifications that appellant lacked, including experience and training in clinical teaching. Following discovery, U.B. filed a motion for summary judgment, asserting that appellant failed to provide sufficient evidence to support his claim. Appellant opposed the motion, contending that there were questions of fact regarding whether U.B. discriminated against him based on his age and whether it had a practice of discriminating against older applicants, which resulted in a disparate impact. The circuit court granted U.B.'s motion for summary judgment. Appellant noted an appeal, and presents two questions for our consideration:

> 1. Whether the circuit court erred in granting summary judgment as to count I, disparate treatment based on age, where the record evidence showed that Dobkin's qualifications were demonstrably superior to those of the hiree and UB presented shifting and inconsistent explanations for not interviewing or hiring him[.]
>
> 2. Whether the circuit court erred in granting summary judgment as to count II, disparate impact based on age, where the record evidence showed that UB has never hired any entry-level candidates who were over the age of 40[.]

For the reasons that follow, we affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2009, U.B. posted an advertisement on the Association of American Law Schools ("AALS") Bulletin, seeking applicants relating to three teaching positions for the 2010–2011 academic year. The advertisement read as follows:

---

> unrelated in nature and extent so as to reasonably precluded the performance of the employment;[ ] . . . .

**3.** The name of the successful applicant, as well as other applicants, have been filed under seal by agreement of the parties.

THE UNIVERSITY OF BALTIMORE SCHOOL OF LAW
* seeks entry level or experienced faculty for tenure-track or tenured positions beginning in the 2009–2010 academic year. We invite applications from candidates who have a distinguished academic background, a record of or the promise of both teaching excellence and scholarly distinction, and a commitment to service in law school and the community. A wide range of teaching interests will be considered, including but not limited to commercial law, intellectual property, immigration, environmental law, contracts, property, criminal law, and torts.

* * *

Positions will remain open until filled but applicants are encouraged to apply as soon as possible to receive full consideration. In keeping with its commitment to a diverse faculty, the law school welcomes applications from all qualified candidates and encourages women and minorities to apply. . . .

Approximately 833 applicants applied for the faculty positions, including appellant and the successful applicant. According to her resume, the successful applicant graduated from the University of Michigan—Ann Arbor in 1999. After her undergraduate studies, she interned with the American Civil Liberties' Union ("ACLU") Immigration Rights Project. She then matriculated to Yale University Law School, where she supervised students and facilitated classes as the Student Director of the Immigration Legal Services Clinic. She graduated in 2003, and became a member of the New York Bar Association. From 2003 to 2005, she was a faculty fellow at Seton Hall University School of Law's Immigration/Human Rights and Civil Litigation Clinics, and designed course work, facilitated seminar classes, and supervised law students in proceedings concerning asylum, human trafficking, immigrant labor rights, and criminal immigration issues. From 2005 to 2008, the successful applicant clerked for judges on the United States ("U.S.") District Court and U.S. Court of Appeals for the Second Circuit. In 2008, she became a clinical teaching fellow at Georgetown University Law Center, where she at-

tended a course on clinical pedagogy, taught law students in the asylum law clinic, and published an article in the Georgetown Immigration Law Review.

As stated in appellant's resume, he obtained his Bachelor of Laws degree from the University of Windsor in Ontario, Canada, where he graduated in the top fifteen percent of his 1975 graduating class.[4] He then attended Northwestern University School of Law, and obtained his Master of Laws degree in 1976. During this same year, he joined the American Medical Association in Chicago, Illinois as an immigration attorney. In 1977 and 1979 respectively, he became licensed to practice law in Illinois and Michigan. In 1979, appellant founded Dobkin & Associates, an immigration law firm. According to appellant, he is a former chairperson of the Immigration Law Section of Oakland County's Michigan Bar Association, an internationally renowned immigration attorney, who has handled over 7,000 cases, and has given lectures concerning immigration law in the U.S., Canada, and England. In 2006 and 2009, appellant published respective immigration law articles in journals from St. Thomas University School of Law in Florida and University of California, Los Angeles School of Law. As further reflected in his resume, appellant retired from active practice to seek a career in academia.

On August 29, 2009, appellant submitted his application materials for the immigration law professor position to Elizabeth Samuels, ("Ms.Samuels"), the Chairperson of the Faculty Appointments Committee ("the Committee").[5] On September 1, 2009, Ms. Samuels confirmed that the Committee received the application, and appellant replied several days later. After not receiving further communication, on February 5, 2010, appellant contacted Ms. Samuels via electronic mail, writing:

---

4. The record is not clear whether a Bachelor of Laws degree from a Canadian institution was or is equivalent to a Juris Doctor in the United States.

5. In Ms. Samuels' affidavit, she stated that the Committee was composed of three male and two female faculty members who were all over the age of forty.

Since I've not heard from UB [sic] concerning my application for the position in Immigration and Administrative Law, I assume there is no interest. I would like to know who was hired for the position?

Ms. Samuels replied the same day, offering her apologies that appellant was not interviewed, and stated that the successful applicant was hired for the new position. Less than an hour later, appellant wrote:

Thanks for answering me. It's simply amazing how law schools choose newbies like [the successful applicant] and don't even bother to interview candidates with a world of experience. Something is seriously wrong here.

From the 833 applications, only 56 applicants were interviewed, and the Committee identified fourteen candidates for "second-round" interviews. In addition to the successful applicant, the Committee hired two others, who were thirty-eight and forty years old respectively. According to Ms. Samuels' affidavit, U.B.'s criteria was "a combination of academic training and success, publications, judicial clerkships, and teaching experience," in conjunction with a Juris Doctor from a top ten U.S. law school. The Committee was highly impressed with the successful applicant's academic credentials, as she was a Yale University School of Law graduate and she clerked on the federal levels. Moreover, the Committee favored her significant experience and training in clinical teaching in the area of immigrant rights.

According to U.B., appellant was neither interviewed nor hired because he had no prior clinical or law school teaching experience, and his academic credentials did not compare favorably to other applicants. He did not graduate from a prestigious law school, and had neither state nor federal clerkship experience. Although appellant practiced law for countless years, he did not possess the additional qualifications that the Committee desired.

On March 18, 2010, appellant filed a charge of age, national origin, and gender discrimination with the Baltimore Community Relations Commission and the Maryland Commission of

Human Relations. Because more than 180 days passed regarding that filing, on November 16, 2010, appellant filed a complaint in the circuit court, alleging that appellee failed to hire him, but instead hired a thirty-two year old woman, who was less experienced and qualified for the position. On January 31, 2011, U.B. filed its answer.

Following discovery, on November 10, 2011, U.B. filed its motion for summary judgment, asserting that appellant (1) failed to submit any evidence that the Committee harbored a discriminatory attitude against applicants over the age of forty; (2) failed to establish that the Committee predicated its decision on the applicants' ages, (3) provided insufficient evidence to establish discriminatory pretext, (4) failed to submit any evidence to dispute that U.B. hired a substantial number of faculty over the age of forty; and (5) failed to identify a policy on statistical evidence that U.B.'s hiring practices had an adverse impact on applicants over the age of forty. On December 6, 2011, appellant filed his opposition to the motion for summary judgment, contending that there were questions of fact regarding whether U.B. discriminated against him based on his age, and whether it had a practice of discriminating against older applicants, which disparately impacted those over the age of forty.

On December 14, 2011, the circuit court granted U.B.'s motion for summary judgment, finding:

> ... The [c]ourt—it's not the [c]ourt's decision to decide that practitioner's [sic] are better for clinical teachers than academicians. Maybe they are. But that's [sic] not the [c]ourt's decision. And that's the core argument that's being made here. And that's what the core evidence is.

> The core evidence is that the University of Baltimore was looking for and ending up hiring somebody who was better described as an academician than a practitioner to teach clinical education. And from Mr. Dobkin's standpoint, particularly since they wanted someone with breadth, that that [sic] was totally wrong. Because they hired somebody who only had experience in one area.

And frankly, the law school didn't care. Because what they were looking at was, [sic] more academic credentials. Those were of high importance to them. Much more important than the practice.

\* \* \*

It really, again, just—and I went though [sic] this several times, because frankly—and went through in particular about the law—because the [appellant] was so adamant about his own qualifications, and the superiority of those. And what it is.

And in the end, on the incompetence, Not discrimination, but incompetence of the Appointment Committee. And that really was his focus. And that that [sic] incompetence leads to that. And, again, that's [sic] not my understanding of the law.

\* \* \*

So, for all of those reasons, you know, Im [sic] going to grant the Motion for Summary Judgment. And it may be that the appellate court has something to teach me that I'm wrong in.

\* \* \*

Thereafter, appellant noted a timely appeal.

## STANDARD OF REVIEW

We review an entry of summary judgment *de novo* to determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Poole v. Coakley & Williams Construction, Inc.*, 423 Md. 91, 108, 31 A.3d 212 (2011). In considering the trial court's grant of a motion for summary judgment, we review the record in the light most favorable to the non-movant. *Bednar v. Provident Bank of Maryland, Inc.*, 402 Md. 532, 542, 937 A.2d 210 (2007) (citing *Rhoads v. Sommer*, 401 Md. 131, 148, 931 A.2d 508 (2007)) ("We review the record in the light most favorable to the non-moving party and construe any reasonable inferences that may be drawn from

the facts against the moving party.") (additional citation omitted).

Summary judgment is not proper when there is a genuine dispute of material fact, including disputes over reasonable factual inferences. *Poole,* 423 Md. at 109, 31 A.3d 212 (citing *Fenwick Motor Co. v. Fenwick,* 258 Md. 134, 136, 265 A.2d 256 (1970) (internal quotation omitted) (additional citation omitted)). The court's function during a summary judgment hearing is to determine whether a genuine dispute of fact exists, including factual inferences. *Charles County Comm'rs v. Johnson,* 393 Md. 248, 263, 900 A.2d 753 (2006).

"Courts must take special care when considering a motion for summary judgment in an employment discrimination case...." *Derrickson v. Circuit City Stores, Inc.,* 84 F.Supp.2d 679, 684 (D.Md.2000) (quoting *Ballinger v. North Carolina Agric. Extension Serv.,* 815 F.2d 1001, 1005 (4th Cir.1987) (omitted quoted sentence)). In such cases, when a party moves for judgment, he or she must present legally sufficient direct or circumstantial evidence to establish that the facts are susceptible to more than one permissible inference. *See Williams v. Maryland Dpt. of Human Resources,* 136 Md.App. 153, 163, 764 A.2d 351 (2000). Legally sufficient means that the injured party cannot sustain its burden by "offering a mere scintilla of evidence, amounting to no more than surmise, possibility, or conjecture...." *Malik v. Tommy's Auto Serv., Inc.,* 199 Md.App. 610, 620, 24 A.3d 114 (2011) (citing *Myers v. Bright,* 327 Md. 395, 399, 609 A.2d 1182 (1992)) (omitted additional citation). Instead, the party must present evidence of legal probative force and evidential value. *Id.* If there is any such evidence, the jury should weigh and determine the value of such evidence. *Id.* at 619–20, 24 A.3d 114.

## DISCUSSION

### I. Whether Appellant Met His Initial Burden Of Establishing A *Prima Facie* Case Of Age Discrimination.

 A complainant may establish that age was a factor in an employer's hiring decision by using direct or circumstantial

evidence. *Williams,* 136 Md.App. at 163, 764 A.2d 351. " 'Evidence is 'direct' ... when it consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.' " *Id.* (quoting *Febres v. Challenger Caribbean Corp.,* 214 F.3d 57, 60 (1st Cir.2000). *See also Taylor v. Virginia Union Univ.,* 193 F.3d 219, 232 (4th Cir.1999).) In the case at bar, the circuit court found that there was no direct evidence, stating "I think everybody would agree here that there's no direct evidence. And I want to be really clear, the fact that there's no direct evidence does not therefore lead to [m]otion for [s]ummary [j]udgment." We agree with the circuit court, that in particular circumstances, circumstantial evidence can be " 'more certain, satisfying and persuasive than direct evidence.' " *Taylor v. Giant of Maryland, LLC,* 423 Md. 628, 652, 33 A.3d 445 (2011) (quoting *Merritt v. Old Dominion Freight Line, Inc.,* 601 F.3d 289, 299–300 (4th Cir.2010) (quoting *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84) (2003)). Thus, because appellant alleges that he has presented circumstantial evidence of pretext and discriminatory intent, we shall review the nature of this theory.

■ In the absence of direct evidence, Maryland Courts have traditionally held that in employment discrimination actions, parties must engage in the four-part burden-shifting paradigm described by the United State Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Giant of Maryland, LLC v. Taylor,* 188 Md.App. 1, 26, 981 A.2d 1 (2009) [hereinafter "*Giant I* "], *rev'd on other grounds* 423 Md. 628, 33 A.3d 445 (2011). *See also Dep't of Natural Res. v. Heller,* 391 Md. 148, 171, 892 A.2d 497 (2006); *Maryland Comm'n on Human Relations v. Kaydon Ring & Seal, Inc.,* 149 Md.App. 666, 695–98, 818 A.2d 259 (2003); *Nerenberg v. RICA of Southern Maryland,* 131 Md.App. 646, 661, 750 A.2d 655 (2000); *Killian v. Kinzer,* 123 Md.App. 60, 68, 716 A.2d 1071 (1998); *Brandon v. Molesworth,* 104 Md.App. 167, 188 n. 18, 655 A.2d 1292 (1995), *aff'd in part, rev'd in part,* 341 Md. 621, 672 A.2d 608 (1996); *Maryland Shipbuilding & Drydock Co., Inc. v. Mary-*

*land Comm'n on Human Relations,* 70 Md.App. 538, 545–46, 521 A.2d 1263 (1987) [hereinafter *"Maryland Shipbuilding"*]; *Levitz Furniture Corp. v. Prince George's County,* 72 Md.App. 103, 111–13, 527 A.2d 813 (1987); *Baltimore and Ohio Railroad Co. v. Bowen,* 60 Md.App. 299, 305, 482 A.2d 921 (1984); *Maryland Commission on Human Relations v. Washington County Cmty. Action Council, Inc.,* 59 Md.App. 451, 455–56, 476 A.2d 222 (1984). Pursuant to this test, to establish a *prima facie* case of failure to hire predicated on unlawful discrimination, the complainant must illustrate that he or she (1) was a member of a protected class; (2) applied and was qualified for the position that he or she sought; (3) was not hired, despite his or her qualifications; and that (4) after the rejection, the position remained open and the employer continued to seek applicants that had his or her qualifications. *Williams,* 136 Md.App. at 165, n. 2, 764 A.2d 351 (citing *McDonnell,* 411 U.S. at 802, 93 S.Ct. 1817). We have noticed various formulations of the *prima facie* factors, and although they "differ in some respects, they share a common nucleus of thought: a *prima facie* case is established when a member of a protected group is [not hired] under circumstances which, if unexplained, would support an inference that the decision to [not hire] was based upon a consideration of impermissible factors." *Levitz,* 72 Md.App. at 112, 527 A.2d 813 (internal quotations omitted).

▉▉▉ Once the complaining party succeeds in his or her initial burden of establishing a *prima facie* case of discrimination, the burden shifts to the employer to assert a "legitimate, non-discriminatory reason" for its failure to hire the complainant. *Giant I,* 188 Md.App. at 26, 981 A.2d 1. *See also Maryland Shipbuilding,* 70 Md.App. at 547, 521 A.2d 1263. "What [the Court] means by a legitimate reason is not a reason that makes sense, but a reason that does not deny equal protection." *Ball v. Martin,* 108 Md.App. 435, 453–54, 672 A.2d 143 (1996) (emphasis omitted) (internal quotation marks omitted). "We highlight that although the presumption favoring the [applicant] falls away once the [employer] offers a non[-]discriminatory explanation for not hiring the [applicant]

in accordance with the second *McDonnell Douglas* prong, the elements of the [applicant's] *prima facie* case remain relevant evidence on the ultimate question of unlawful discrimination." *McGarry v. Pielech,* 47 A.3d 271, 281 (R.I.2012) (italics added). *See also Center for Behavioral Health, Rhode Island, Inc. v. Barros,* 710 A.2d 680, 685 (R.I.1998) (quoted sentence omitted) (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (additional citations omitted). *See also Nerenberg,* 131 Md.App. at 662, 750 A.2d 655 (stating, "If the [employer] meets this burden, the presumption created by the *prima facie* case disappears." The [complainant], however, has the ultimate burden of persuasion) (citing *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 197 (4th Cir.1997)). Thus, if the employer's reasons are acceptable, the complainant may still demonstrate that the employer's explanations were pretextual **and** that discrimination was the underlying motive for not being hired. *Nerenberg,* 131 Md.App. at 662, 750 A.2d 655 (emphasis added).

■ Pretext may be demonstrated by establishing that the employer favored other similarly situated applicants, who were not members of the protected class, and disfavored him or her. *Giant I,* 188 Md.App. at 26, 981 A.2d 1. Therefore, to survive a grant of summary judgment, the complainant must offer sufficient evidence to counter the employer's rationale, and establish that there was "a reasonable probability, rather than a mere possibility, that [the] employer discriminated against [him or] her...'" *Nerenberg,* 131 Md.App. at 674, 750 A.2d 655 (quoting *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 298 (4th Cir.1998)).

■ Having outlined the legal structure of *McDonnell Douglas,* we now analyze the burden-shifting model to the case at bar. Regarding the first factor, it is uncontested that appellant, who was 56 years old at the time of his application, is a member of a protected class. Furthermore, appellant satisfies factors three and four because U.B. did not hire him, and after rejecting appellant, the position remained open to which U.B. sought other applicants.

Concerning the second factor, U.B. avers that appellant lacked clinical teaching experience, which was a required quality to merit an interview. However, one of the Committee members, Dionne Koller ("Ms.Koller"), stated during her deposition, "... I would not say [appellant was] less qualified, I would say less attractive." We surmise that an applicant need only meet the minimum requirements as set forth in the posted job description, and hence, appellant met his initial burden of establishing a *prima facie* case of age discrimination.

## II. Whether U.B. Asserted A "Legitimate, Non–Discriminatory Reason" For Its Employment Decision.

■ As previously stated, once appellant succeeds in his initial burden, the burden shifts to U.B. to assert a "legitimate, non-discriminatory reason" for its failure to hire the complainant. *See Giant I,* 188 Md.App. at 26, 981 A.2d 1. *See also Maryland Shipbuilding,* 70 Md.App. at 547, 521 A.2d 1263. According to U.B., appellant was neither interviewed nor hired because he had no clinical teaching experience, and his academic credentials did not compare favorably to other applicants. He did not graduate from a top ten U.S. law school and had no judicial clerkship experience. As indicated by U.B., although appellant practiced law for many years and published law review articles in recent years,[6] he did not possess clinical teaching experience, which the Committee desired. These reasons are legitimate and nondiscriminatory.

## III. Whether Appellant Met His Burden By Submitting Sufficient Evidence From Which A Trier Of Fact Could Reasonably Find That U.B.'s Reasons Were Pretextual And Discriminatory.

In *Baltimore and Ohio Railroad Co. v. Bowen,* 60 Md.App. 299, 301, 482 A.2d 921 (1984) [hereinafter *"Bowen "*], the

---

6. There was an argument regarding how many law review articles appellant published, as he contended four, and though U.B. noted this fact, it argued that only two were published in reputable and distinguished journals.

plaintiff applied for a railroad personnel position, but an examination by the defendant's, a railroad company, physician indicated that a bullet was lodged in the plaintiff's lumbar vertebra.[7] As a result, the defendant did not hire him. *Id.* The plaintiff filed a complaint with the State Commission on Human Relations, contending that the defendant discriminated against him based on his physical disability. *Id.* at 302, 482 A.2d 921. Upon a finding of unlawful employment discrimination, the defendant appealed to the circuit court, which affirmed the Commission's ruling. *Id.* at 304, 482 A.2d 921. On appeal to our Court regarding the burden of proof, we stated:

> ... Once [the plaintiff] established a *prima facie* case of handicap discrimination—that he was physically able to perform the duties of a carman's helper—the burden of persuasion properly shifted to [the defendant] to establish to a "reasonable probability" its defense that [the plaintiff's] physical handicap would create a future hazard to his health or safety.

*Id.* at 309, 482 A.2d 921. Our Court examined the defendant's evidence, including testimony from a railroad employee, who stated that workers were required to lift heavy equipment and often bend in uncomfortable positions, as well as the physician's testimony, who asserted that there was a possible danger of additional injuries. *Id.* at 303–04, 482 A.2d 921. We stated that the defendant's evidence was insufficient, as it only demonstrated a risk of a future hazard, and there was testimony that the plaintiff was physically competent to perform the duties. *Id.* at 313, 482 A.2d 921. Accordingly, we affirmed the circuit court's ruling. *Id.*

In *Taylor v. Giant of Maryland, LLC,* 423 Md. 628, 632–33, 33 A.3d 445 (2011) [hereinafter "*Giant II* "], the plaintiff, a tractor-trailer driver, filed a complaint with the Human Rela-

---

7. As a U.S. Army soldier, the plaintiff sustained a gunshot injury, and the Army surgeon advised that the bullet remain in the plaintiff's vertebra because it posed no health risks. *Bowen,* 60 Md.App. at 301, 482 A.2d 921.

tions Commission, alleging gender discrimination when the defendant required her to undergo health examinations for hemorrhaging and uterine fibroids, but did not require the same for her male co-workers. A jury returned a verdict against the plaintiff, but found that the defendant retaliated against her for filing the complaint. *Id.* at 640–41, 33 A.3d 445. The circuit court awarded the plaintiff's attorney fees of $511,255 and costs of approximately $33,670. *Id.* at 641, 33 A.3d 445. Our Court reversed, concluding that:

> ... [T]he independent medical examination was not an adverse employment action and that [the plaintiff's] male comparators were "not similarly situated to her, as a matter of law," because they had different supervisors and their health conditions could be followed and monitored through the Department['s] ... mandatory physicals.

*Id.* at 642, 33 A.3d 445. The Court of Appeals reversed and remanded to our Court, determining that the plaintiff established gender discrimination, as she produced sufficient evidence of her four male counterparts, who sustained severe medical issues, but were not required to undergo a medical analysis. *Id.* at 656, 33 A.3d 445.

In *Williams v. Maryland Dpt. of Human Resources*, 136 Md.App. 153, 160, 764 A.2d 351 (2000), the plaintiff filed a gender discrimination action when the defendant promoted a woman instead of him.[8] The circuit court granted summary judgment on all counts to which the plaintiff appealed. *Id.* The defendant argued that the plaintiff was not promoted because his " 'interview was not as good as [the three] top candidates [and his] ability to interact at [the] supervisory level [was] questionable.' " *Id.* at 161, 764 A.2d 351. The plaintiff presented testimony from his former supervisor who opined that the position was not open to any male applicants, and that a panel member indicated that it had to hire a female.

---

8. Our Court affirmed the grant of summary judgment regarding the plaintiff's age discrimination claim because he acquiesced to summary judgment during the motion's hearing. *Williams,* 136 Md.App. at 176, 764 A.2d 351.

*Id.* at 167–68, 764 A.2d 351. Though the plaintiff offered circumstantial evidence that he was more qualified than the successful candidate, and that the defendant failed to follow its promotion process, we stated, "that this evidence, by itself, would not be sufficient to establish [the plaintiff's] claim." *Id.* at 174, 764 A.2d 351. However, because the direct evidence was adequate enough, we reversed the ruling concerning the gender discrimination count. *Id.* at 161, 764 A.2d 351.

In *Maryland Shipbuilding & Drydock Co., Inc. v. Maryland Comm'n on Human Relations,* 70 Md.App. 538, 542, 521 A.2d 1263 (1987), the defendant failed to promote the plaintiff to lieutenant guard.[9] As a result, the plaintiff filed a complaint with the Maryland Commission on Human Relations, averring that racial discrimination was the true motive for denying him the promotion. *Id.* The Commission agreed with the plaintiff, and the defendant appealed to the circuit court, which affirmed. *Id.* at 544, 521 A.2d 1263. On appeal to our Court, the defendant contended that the plaintiff was not assertive, lacked logical thinking and writing skills, and sustained a knee injury that would affect his ability to perform specific duties. *Id.* at 552, 521 A.2d 1263. Our Court concluded that there was substantial evidence that the plaintiff's injury was never mentioned prior to his desire for a promotion, he conducted the duties without difficulty, his written reports were "understandable and intelligible," and he was never informed that he lacked assertiveness, responsibility, or analytical skills. *Id.* at 552–53, 521 A.2d 1263. We concluded that the defendant's reasons for not promoting the plaintiff were pretextual and discriminatory, and thus affirmed the circuit court's ruling. *Id.* at 553–54, 521 A.2d 1263.

In *Nerenberg v. RICA of Southern Maryland,* 131 Md.App. 646, 654, 750 A.2d 655 (2000), the decedent's estate filed a disability discrimination action against the defendant, alleging that the defendant discharged the deceased, a psychiatric

---

9. In *Maryland Shipbuilding,* 70 Md.App. at 542, 521 A.2d 1263, the plaintiff was the first and only African–American person to be hired as a guard for the defendant.

social worker, because she suffered from diabetes. The defendant filed a motion for summary judgment, which the circuit court granted. *Id.* at 659, 750 A.2d 655. The defendant submitted evidence that the decedent (1) was distracted throughout the day, and became overly-sensitive, making her vulnerable to subjectivity; (2) argued with a doctor in an incident involving a copy machine; (3) designed uncomfortable, trusting exercises for her children, which involved physical contact; and (4) planned a trip to which her children would observe a violent movie with explicit language. *Id.* at 665–66, 750 A.2d 655. Although the estate did not dispute that the above-mentioned occurrences happened, it produced deposition testimonies from the former directors, who hired and supervised the decedent. *Id.* at 666–67, 750 A.2d 655. They testified that they did not ascertain any issues with the decedent's duties, and that the children adored her. *Id.* at 667, 750 A.2d 655. Our Court determined that the estate neither established that the decedent met her employer's expectations, nor that there was a reasonable inference of unlawful disability discrimination, or that the defendant's explanation for discharging her was pretextual and encompassed discriminatory intent.[10] *Id.* at 686, 750 A.2d 655. Thus, our Court affirmed the circuit court's ruling. *Id.*

Although Maryland's case law regarding employment discrimination for promotions and wrongful termination are useful, they slightly differ from the case at bar, a "failure to hire" action, because the plaintiffs were current employees.[11] Al-

---

10. Our Court in *Nerenberg*, 131 Md.App. at 663, 750 A.2d 655, identified the *McDonnell Douglas* factors slightly different from the elements we use in the case at bar: "1) that [employee] was in a protected class; 2) she was discharged; 3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and 4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination."

11. In "failure to promote" actions, "[a]n appointing authority may promote from within an organizational unit a qualified candidate who is the incumbent in a position that is reclassified without requiring that the qualified candidate be on an eligible list for the particular classification...." *Williams*, 136 Md.App. at 175, n. 6, 764 A.2d 351 (citing

though *Bowen,* an approximate thirty year old case, was a "failure to hire" case, it was predicated on disability discrimination, as well as *Nerenberg,* to which the issues were whether the employees were physically and mentally able to perform their duties. Although the plaintiff in *Williams* argued that his qualifications were superior to the successful candidate, our Court did not compare the qualifications, training, skills, or experiences of the applicants. Furthermore, *Giant II* focused on the medical differences of male and female employees, and *Maryland Shipbuilding,* the employer failed to meet its burden of presenting a legitimate, nondiscriminatory reason for its employment decision. Appellant and the successful applicant were never U.B. employees, so we therefore analyze our sister states' "failure to hire" actions. Furthermore, "[f]ederal courts have permitted [complainants] to prove discrimination with circumstantial evidence" by demonstrating that " 'similarly situated individuals outside the[ir] protected class were treated more favorably.' " *Giant II,* 423 Md. at 652, 33 A.3d 445 (quoting *Benuzzi v. Bd. Of Educ.,* 647 F.3d 652, 662 (7th Cir.2011)). Hence, we also examine federal case law to offer additional insight on the governing issues.

### Qualifications

In *Casey v. Town of Portsmouth,* 861 A.2d 1032, 1034 (R.I.2004), the Rhode Island Supreme Court sought to determine whether an employer failed to hire an applicant because of his age. The plaintiff was fifty-one years old when he interviewed for the town's utility personnel position, and fifty-two years of age when he interviewed for the second time. *Id.* at 1035. On both occasions, the plaintiff obtained the highest score on the written examination, but was not selected for the position. Instead, two other applicants, who scored lower, and were twenty-eight and thirty-eight years old respectively, obtained the positions. *Id.* The plaintiff filed a complaint, alleging age discrimination to which the defendants moved for

---

COMAR 06.01.01.13C. (2). We briefly note that promotions are no longer addressed in COMAR 06.01.01.32–2, but are currently covered pursuant to COMAR17.04.02.02(C)(2)).

summary judgment. *Id.* The circuit court granted the motion. *Id.*

On appeal, the defendant argued that it did not hire the plaintiff because he interviewed poorly, which the plaintiff recognized as a legitimate, non-discriminatory reason. *Id.* at 1038. Nonetheless, he contended that the court erred in granting summary judgment because "whether he was not hired because of a poor interview that was a pretext for age[-] based animus because that justification [was] subjective." *Id.* The Rhode Island Supreme Court determined that the plaintiff's arguments were not sufficient evidence, and that it would not require an employer to "choose between hiring an applicant despite a poor interview and defending an employment discrimination lawsuit." *Id.* at 1040.

In *McGarry v. Pielech*, 47 A.3d 271, 276 (R.I.2012), the Rhode Island Supreme Court again determined whether the plaintiff was a victim of age discrimination when the defendant did not hire him for advertised teaching positions. The plaintiff filed a complaint, alleging that the defendant failed to hire him because he was fifty-six years old. *Id.* at 275–76. During trial, the defendant presented evidence that (1) no one on the interviewing committee mentioned the plaintiff's age, (2) the successful candidate previously worked in the school department for several years, and possessed student teaching experience, and (3) the plaintiff was ranked lower than other applicants. *Id.* at 277. Relating to the applicants' qualifications, the plaintiff testified that

[H]e earned an undergraduate degree in economics, and later an MBA degree. . . . [H]e worked as a teacher at [the town's high school] from 1969 to 1970, but left to work in the trucking industry—a more lucrative field—where he remained for twenty-six years until he reactivated his teaching certificates in 1996. In 1997, [the] plaintiff began substitute teaching in the [town's] school system. The plaintiff testified that upon learning of a probable teaching vacancy in [the town's] [m]iddle [s]chool's English Department for the 1998–1999 school year, he enrolled in two English courses, and in July 1998, he obtained a certificate to teach English.

*Id.* at 276. In comparison, one of the successful candidates possessed a Bachelor of Arts in English, minored in journalism, and enrolled in countless writing courses. *Id.* at 277, n. 6. The other candidate obtained a Master's degree in teaching. Id. Although the plaintiff was a fair applicant, the defendant determined that the others possessed superior qualifications. *Id.* at 277.

The jury returned a verdict for the plaintiff. *Id.* at 278–79. At the end of trial, the defendant renewed his motion for summary judgment to which the circuit court granted.[12] *Id.* at 279. The Rhode Island Supreme Court stated that the circuit court erred in granting the defendant's motion for summary judgment because the plaintiff provided sufficient evidence, stating

> ... [T]here was evidence that [the] defendant, possibly through negligence, misrepresented to the Commission that [the] plaintiff was not qualified to teach English. These factors, combined with the evidentiary inference that the missing records were unfavorable to defendant,[13] to wit, the official explanation for not hiring [the] plaintiff was false (which the jury could decide with or without the inference), could [have] prove[n] that the real reason he was not hired was his age.

*Id.* at 285.

In *Perkins v. Doyon Universal Servs., LLC,* 151 P.3d 413, 415 (Alaska 2006), the plaintiff filed a complaint in the circuit court, averring that the defendant failed to hire him as a kennel technician at its animal care center based on his race.[14]

---

**12.** The plaintiff also renewed his motion for a new trial. However, pertinent to our analysis is the motion for summary judgment. *McGarry,* 47 A.3d at 279.

**13.** The missing records were interview sheets to which the interviewers took handwritten notes concerning the applicant, and rated his or her responses to questions. However, the records were determined to be missing. *McGarry,* 47 A.3d at 276–277.

**14.** The plaintiff also applied for an animal enforcement officer position, but pertinent to our analysis is the kennel technician position because

The defendant moved for summary judgment, maintaining that the successful candidate's qualifications were superior to the plaintiff's qualifications:

> ... [T]he successful candidate's experience was directly in line with the duties of a kennel tech at Anchorage Animal Control Center. The resume of the man hired indicated that he had worked at a kennel from 1990 to 1998 performing building maintenance and caring for dogs.... [S]he hired him primarily because of his eight years of experience working at Coshok's Canine Castle. In comparison, [the plaintiff's] resume listed his experience as five years and two months employment as a laboratory animal technician.

*Id.* at 417. Furthermore, the defendant did not favor the plaintiff's experience in "[b]leeding monkeys" in a research laboratory because it was inhumane. *Id.* The Alaska Supreme Court rendered this a legitimate, non-discriminatory reason. *Id.* To establish that the defendant's reasons were pretextual and encompassed discriminatory intent, the plaintiff offered evidence that one of the successful candidates indicated that he was a felon, and that he did not possess a driver's license. *Id.* at 418. The Court affirmed the circuit court, concluding that the plaintiff failed to meet his burden of proof because:

> There [was] no indication that a misdemeanor conviction or the lack of a driver's license would have diminished an applicant's suitability, or rendered the applicant ineligible for the kennel technician position. The fact [the defendant] hired someone with a prior misdemeanor conviction and without a driver's license [did] not imply discrimination against [the plaintiff] and there was no genuine dispute of material fact with regard to the criminal record or driver's license.

*Id.*

In *Reeves v. MV Transportation, Inc.,* 186 Cal.App.4th 666, 669, 111 Cal.Rptr.3d 896 (Cal.Ct.App.2010), the defendant

---

the Alaska Supreme Court compared the successful candidate's qualifications with those of the plaintiff's. *See generally Perkins,* 151 P.3d at 417.

posted an advertisement for a staff attorney position, with experience in labor and employment litigation. The plaintiff applied, but did not receive an interview. *Id.* He filed a complaint against the defendant, alleging that it failed to hire him because he was 56 years old. *Id.* at 673, 111 Cal.Rptr.3d 896. The plaintiff established a *prima facie* case of unlawful employment discrimination, to which the defendant articulated the following legitimate, nondiscriminatory reasons:

[The] plaintiff had (1) used time and resources at [his] work to apply for the job; (2) sent him an e-mail he regarded as arrogant; (3) not highlighted litigation experience on his resume; and (4) not worked for a law firm.

*Id.* at 672, 111 Cal.Rptr.3d 896. The defendant filed a motion for summary judgment, which the circuit court granted. *Id.* On appeal, agreeing that the defendant offered adequate reasons, the plaintiff maintained that amongst other contentions, his superior qualifications were sufficient evidence of pretext to survive the motion for summary judgment. *Id.* at 674, 111 Cal.Rptr.3d 896.

The California appellate court determined that the plaintiff had more experience and training in labor law, but the successful candidate "listed management of all phases of employment litigation in state and federal courts, [and] had the more recent employment law experience." *Id.* at 676, 111 Cal. Rptr.3d 896. Though the plaintiff had a slight edge because he was willing to litigate, the successful candidate possessed several advantages because she was recommended by a well-respected attorney, barred in New York, and previously worked at a law firm. *Id.* at 677, 111 Cal.Rptr.3d 896. In addition to its other reasoning, discussed *infra*, the Court determined that the plaintiff failed to present sufficient evidence of pretext and discriminatory intent, and affirmed the circuit court's ruling. *Id.* at 683, 111 Cal.Rptr.3d 896.

In the case at bar, we do not discount the years of immigration law experience that appellant possesses. According to the record before us, he has handled over 7,000 cases, founded an immigration law firm, which he claimed was the largest of

its kind, and has given global lectures on this specialized area of law. However, U.B. desired a candidate who had a "record of or the promise of both teaching excellence and scholarly distinctions," and this was where the successful applicant was highly favored. She was a Student Director at Yale Law School's Immigration Legal Services Clinic, where she supervised students and facilitated classes. After graduation, she joined Seton Hall University School of Law's Immigration/Human Rights and Civil Litigation Clinics, as a faculty fellow, to which she facilitated seminar classes and supervised law students regarding immigrant rights. She honed her research and writing skills as a federal judicial clerk. Moreover, she became a clinical teaching fellow at Georgetown University Law Center, and published an article in the Georgetown Immigration Law Review. Becoming a clinical law fellow at Georgetown Law Center is quite remarkable, as the Law Center has been ranked one of the highest in the nation for its clinical training capabilities. *Education—Grad Schools,* U.S.NEWS & WORLD REPORT, 2013, *available at* http://grad-schools.usnews.rankingsandreviews.com/best-graduate-schools/top-law-schools/clinical-training-rankings (last visited Mar. 11, 2013).

 Appellant avers that the successful applicant "had never practiced immigration law, and had experience in the academic setting in only one narrow and esoteric area of immigration law—asylum law, compared to [his] experience in every area of immigration law...." Appellant further maintains:

> ... I have the greatest pedagogy in the world, being an expert in virtually every area of immigration law, and I have taught—I took people in who couldn't, you know, couldn't make a living and I gave them a profession they never had.

Firstly, "a disgruntled employee's self-serving statements about his [or her] qualifications and abilities generally are insufficient to raise a question of fact about an employer's honest assessment of that ability." *Williams,* 136 Md.App. at 174, 764 A.2d 351 (citing *Dey v. Colt Constr. & Dev. Co.,* 28

F.3d 1446, 1460 (7th Cir.1994)). Secondly, as Ms. Samuels stated in her affidavit, "if a person had practiced for a considerable length of time, had sophistication about the clinical law teaching pedagogy and experience in that area and a distinguished academic background, that would be a good combination of the qualities [the Committee was] looking for." Appellant disagrees with Ms. Samuels, stating that "[he] could not imagine teaching immigration law without first immersing [himself] in the practice." However, U.B.'s position was that an academic was better suited for its position as an immigration law professor.

Furthermore, we stated in *Univ. of Baltimore v. Peri Iz*, 123 Md.App. 135, 155, 716 A.2d 1107 (1998) [hereinafter *"Peri Iz"*] that:

The evaluation of the performance of a college professor and of his or her suitability to the educational needs, goals and philosophies of a particular institution necessarily involves many subjective, nonquantifiable factors. The assessment of these factors is best performed by those closely involved in the life of the institution, not by judges.... Even if the faculty member's performance has been exemplary, measured by the most objective yardstick possible, the institution may wish to hire another person because, for example, an individual with superior qualifications has become available, or the institution decides that this particular faculty member does not mesh with the institution's educational goals and philosophies, however excellent his [or her] work and distinguished his [or her] scholarship. *As a matter of sound public policy an institution of higher learning should be free to make such decisions ....*

(additional citations omitted) (emphasis in original).

We cannot thereby demand or require U.B. to hire applicants with practical experience as opposed to academic training, as it has a right to choose what qualifications address their needs. Appellant must understand that his and the successful applicant's qualifications were not equivalent like the applicants in *Reeves*. Instead, they were different types

of skills and training. Accordingly, because qualifications are relative, as it depends on the preference of the employer, we cannot deem appellant's qualifications as superior than the successful applicant's in this case.

### Inconsistent Justifications

 Although the *Reeves* Court offers a pertinent analysis on qualifications, we also examine it for the purposes of inconsistent justifications. In *Reeves*, 186 Cal.App.4th at 669, 111 Cal.Rptr.3d 896, *supra*, the plaintiff maintained that "the defendant's inconsistent justifications for the hiring decision, and [the] defendant's spoliation of relevant evidence" were sufficient evidence of pretext to survive the motion for summary judgment. *Id.* at 674, 111 Cal.Rptr.3d 896. The plaintiff claimed that the defendant asserted inconsistent statements during his interview with the fair employment investigator and during his interrogatories. *See id.* During the interview, the general counsel stated that "he had interviewed only three candidates for the job because he was working long hours and did not have time for a lot of interviewing." *Id.* at 677, 111 Cal.Rptr.3d 896. However, during his interrogatories, the counsel stated that the "plaintiff was not interviewed" because " '[t]he first candidate interviewed appeared to meet all of the job requirements and was otherwise so outstanding that [the defendant] hired her before any other applicants were interviewed.' " *Id.* at 678, 111 Cal.Rptr.3d 896.

The California appellate court concluded that these inconsistencies were not consequential, and that they failed to qualify as a shifting reason for the defendant's employment decision. *Id.* at 678–79, 111 Cal.Rptr.3d 896. Firstly, the general counsel was the only person responsible for hiring, and his thoughts regarding the plaintiff's qualifications were regularly asserted. *Id.* at 679, 111 Cal.Rptr.3d 896. Furthermore, "[the counsel's] imperfect recollections and slight exaggerations [were] not the kind of ' "fundamentally different justifications" ' that courts have deemed sufficient for an employment decision." *Id.* at 680, 111 Cal.Rptr.3d 896 (quoting *Equal*

*Employment Opportunity Comm'n v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2nd Cir.1994).) Regarding the spoliation argument, the Court determined that although the defendant was required to preserve the applications for two years, spoliation by itself did not create a triable issue. *Id.* at 682, 111 Cal.Rptr.3d 896. Thereby, the Court affirmed the circuit court's ruling to grant summary judgment. *Id.* at 683, 111 Cal.Rptr.3d 896.

In *Equal Employment Opportunity Comm'n v. Sears Roebuck and Co.,* 243 F.3d 846, 852 (4th Cir.2001) [hereinafter *"Sears "*], the U.S. Court of Appeals for the Fourth Circuit determined whether the defendant's inconsistent statements were sufficient evidence to satisfy the plaintiff's burden of proof regarding pretext. In *Sears,* the plaintiff, a Mexican–American, inquired regarding a loss prevention agent position at a North Carolina Sears Department Store.[15] *See generally id.* at 847–48. After countless attempts at applying, visiting the store, and interviewing, the plaintiff filed a complaint in the federal district court, alleging discrimination based on his national origin. *Id.* at 849. After discovery, the employer filed a motion for summary judgment, which the Court granted. *Id.* at 851.

On appeal, the Fourth Circuit determined that the plaintiff established a *prima facie* case concerning unlawful discrimination, and that the defendant offered a legitimate, nondiscriminatory reason. *Id.* at 852. The plaintiff argued that the defendant's inconsistent statements were evidence of pretext, and the Court agreed. *See id.* at 852. "[The defendant] ha[d], over time, proffered several reasons for its failure to hire [the plaintiff], including the selection of someone else, a lack of available hours in the loss prevention department, and the belief that [the plaintiff] had been investigated for sexual harassment in the past." *Id.* The Fourth Circuit concluded

---

**15.** In California, the plaintiff served in the U.S. Marine Corps, but worked part-time as a loss prevention agent at Sears. The Marines transferred him to North Carolina, and he sought employment for the same position he possessed for ten years in California. *See generally Sears,* 243 F.3d at 847–48.

that there was sufficient evidence from which a trier of fact could determine that the defendant's " 'asserted justification [was] false,' " and probative of pretext. *Id.* at 852–53.

In *Price v. Thompson*, 380 F.3d 209, 211–12 (4th Cir.2004), the plaintiff applied and interviewed for two technology positions at a medical center. The plaintiff later discovered that the defendant hired an applicant with alleged inferior qualifications. *Id.* at 212. He filed an employment discrimination complaint in the U.S. District Court for the District of Maryland, but the court granted the defendant's motion for summary judgment, finding that the plaintiff did not establish his *prima facie* case. *Id.*

On appeal, the defendant presented the following reasons regarding its failure to hire the plaintiff: (1) he was less qualified and non-certified, (2) he was working in the technology field during the application phase, and likely required a "refresher" course, and (3) he wanted to re-classify the position. The U.S. Court of Appeals for the Fourth Circuit surmised that although the defendant was incorrect concerning the plaintiff's certification, there were no inconsistencies in the defendant's rationale because the defendant later asserted that the plaintiff was experienced, the successful candidates were working as technology personnel, and because of new technology, the plaintiff required additional training, and the plaintiff indicated that " 'he could also see [the job] as someone acting as a liaison between [him] and the engineering staff and the administrative staff,' " which was not in the job's description. *Id.* at 215–17. The court ultimately concluded that simple "inconsistent statements that ar[o]se from reading applications hastily or from being nervous during depositions" did not establish sufficient evidence concerning pretext and discriminatory intent. *Id.* at 217, n. 5.

In *Byrnie v. Town of Cromwell*, 243 F.3d 93, 98 (2nd Cir.2001), the plaintiff alleged that the defendants failed to hire him as an art teacher because of his age. The 64 year old plaintiff possessed two degrees in art education, taught art at the secondary school level for over twenty years, was a former

substitute teacher at the school at which he applied, and possessed teaching certifications in art. *Id.* When the plaintiff was not hired, he filed a complaint with the U.S. District Court for the District of Connecticut, which held that there was insufficient evidence to find pretext. *Id.* at 100. The plaintiff appealed to the U.S. Court of Appeals for the Second Circuit. *Id.* The defendants first stated that he was not hired because he interviewed poorly, and was not knowledgeable of the state's competency manual. *Id.* at 105–06. Later, the defendants maintained that the plaintiff's responses to interview questions lacked a familiarity with effective teaching methods. *Id.* at 104. The court stated that the defendants' explanations were misleading as many of the candidates did not have a keen insight concerning the state's competency manual, and regarding the lack of teaching methods, the court asserted that:

> [t]his assertion [was] particularly hard to swallow given that [the plaintiff] had been a substitute teacher at [the school] for five years and was often asked to take over classes for extended periods when other teachers were on leave. It strain[ed] credulity to believe that a teacher unfamiliar with the competencies necessary for effective teaching would be relied upon for so long.

*Id.* at 105. The court concluded that although the two reasons were not necessarily inconsistent, the defendant's explanations raised credibility issues. *Id.* at 105–06. As a result, in conjunction with the plaintiff's other evidence, the issue of age discrimination was a matter for a jury to decide. *Id.* at 111.

In the case at bar, appellant avers that U.B. originally advertised for an immigration law professor, as opposed to a clinical law position. Regarding appellant's first contention, the advertisement stated the following:

> THE UNIVERSITY OF BALTIMORE SCHOOL OF LAW * seeks entry level or experienced faculty for tenure-track or tenured positions beginning in the 2009–2010 academic year. We invite applications from candidates who have a distinguished academic background, a record of or the promise of both teaching excellence and scholarly distinc-

tion, and a commitment to service in law school and the community. A wide range of teaching interests will be considered, including but not limited to commercial law, intellectual property, immigration, environmental law, contracts, property, criminal law, and torts.

The advertisement did not specifically state "clinical law experience," but did allude to "teaching excellence." U.B. included the minimum qualifications that applicants needed to likely obtain an interview. Appellant does not support his contention with any case law, which requires that advertisements include every desired qualification, so we are not persuaded by his assertion.

Appellant also maintains that U.B. shifted its position regarding why he was not hired because it originally stated the following in its in interrogatory:

[Appellant] was not among the 56 individuals to be selected to be invited for an interview out of the original 833 candidates. Twenty-two of the original 833 candidates, including [appellant], listed both immigration law and clinical teaching as subject areas in which they would be interested in teaching. Of that group, nine individuals actually had clinical law teaching experience. [Appellant] did not. Although [appellant] practiced immigration law for 25 years before 2004 and had published two law review articles in recent years, the Committee concluded that his academic credentials were inferior to others in the group of 22, and more important, he lacked clinical law teaching experience. As such, he was not selected by the Faculty Appointments Committee to be interviewed for the position of director of the immigrant rights clinic.

However subsequent, it asserted that he lacked clerkship experience. Once again, we examine U.B.'s advertisement, which desired applicants with "distinguished academic background and scholarly distinctions." In the legal profession, judicial clerkships are both prestigious and valuable because law school graduates improve their research and writing skills under the tutelage of a judge by drafting and re-writing

opinions. The graduate obtains a thorough understanding of trial and/or appellate procedure. Clerkships broaden the graduate's level of legal concepts by exposure to several different areas of law. Analytical and time management skills are also sharpened. Overall, clerkships lead to a plethora of career paths and permit the graduate to have a lifetime bond with his or her judge. The alleged discrepancies do not amount to the type of inconsistent explanations presented in *Sears*, and are therefore not probative of pretext.

### IV. Whether Appellant Presented Sufficient Evidence That U.B. Had A Practice Of Discriminating Against Older Applicants, Which Resulted In A Disparate Impact Against Applicants Over Forty.

▉ According to the Fourth Circuit,

[s]tatistics with regard to the defendant's employment policy and practice may be helpful to a determination whether its action in a particular case conformed to a general pattern of discrimination. Although statistics cannot alone prove the existence of a pattern or practice of discrimination, or even establish a *prima facie* case shifting to the employer the burden of rebutting the interference raised by the figures, " 'statistical analysis served and will continue to serve an important role[ ] in cases in which the existence of discrimination is disputed.' "

*Derrickson*, 84 F.Supp.2d at 689 (quoting *Warren v. Halstead Indus.*, 802 F.2d 746, 753 (4th Cir.1986)) (internal citations omitted).

In *Turner v. Public Serv. Co. of Colorado*, 563 F.3d 1136, 1140 (10th Cir.2009), the U.S. Court of Appeals for the Tenth Circuit determined whether a power plant's protocol for hiring new employees was discriminatory. The plaintiff filed a complaint predicated on sex discrimination when the defendant failed to hire her on three occasions. *Id.* The plaintiff filed a complaint in the U.S. District Court for the District of Colorado, to which the defendant moved for summary judgment, arguing that the plaintiff failed to meet her burden of proof.

*Id.* at 1142. The U.S. District Court granted the defendant's motion for summary judgment, and the plaintiff appealed. *Id.* Amongst other reasons, the plaintiff contended that (1) only one of the defendant's 115 employees was a woman, (2) no woman was hired from 1992 to 2005, but the defendant hired twenty men, and (3) she applied and was not hired three times. The Tenth Circuit concluded that:

> First, . . . [w]ithout evidence regarding the number of male and female applicants, interviewees, and the like, the employment statistic [was] nearly meaningless. . . . Second, [the plaintiff] . . . fail[ed] to account for the fact that another woman participated in the same 2004 application process as [the plaintiff], performed second-best among seventeen interviewees, and received a job offer. . . . [The plaintiff] admits that [the defendant] was subject to a hiring freeze for a large portion of [1992 to 2005], and no candidates— regardless of their sex—could have been hired then. . . . [Furthermore, the plaintiff] neglect[ed] to mention it hired three women for entry-level positions [in 2006]. . . . Finally, none of [the plaintiff's] statistics eliminate[d] [the defendant's] *non[-]discriminatory* reason for refusing to hire her.

*Id.* at 1147–48 (additional citations omitted). Thus, the plaintiff presented insufficient evidence of statistics that established pretext and discriminatory intent. *Id.* at 1148. For this reason, along with others, the Tenth Circuit affirmed the U.S. District Court's ruling. *Id.* at 1150.

In the case at bar, appellant had the burden of producing sufficient evidence to demonstrate that U.B.'s reasons were not credible and were probative of age discrimination. Appellant avers that he established his *prima facie* case of disparate impact by identifying U.B.'s specific employment practice that had a substantial disparate impact on older applicants. Appellant alleges that U.B. had a "practice and policy of discriminating against entry-level applicants over the age of 40 . . .," as he maintained that U.B.'s selection rate for entry-level applicants over the age of forty was zero.

Appellant substantiates his argument with *Hazelwood School Dist. v. United States*, 433 U.S. 299, 301, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) [hereinafter *"Hazelwood"*], in which the U.S. Attorney General sued a St. Louis school district for engaging in a pattern of employment discrimination against African–American teachers. In *Hazelwood*, the U.S. Supreme Court stated that the Eighth Circuit "erred in disregarding the [school district's] post-[Civil Rights] Act [of 1964] hiring statistics in the record . . .", *id.* at 313, 97 S.Ct. 2736 because "it gave no consideration at all to the possibility that post-Act data as to the number of [African–Americans] hired compared to the total number of [African–American] applicants. . . ." *Id.* at 310, 97 S.Ct. 2736. As a result, the U.S. Supreme Court reversed.

*Hazelwood* is fairly distinguishable from the case at bar because the plaintiff and the defendant offered statistics, percentages, and comparisons, but appellant offered none based on the record before us, and failed to include a demography of the available hiring pool. Hence, the case at bar is akin to *Turner* because appellant merely provides ad-hoc statistics.

> [S]tatistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate, non[-]discriminatory rationale for its decision to dismiss an individual employee. . . . This is because a company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual.

*LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir.1993) (citing *Walther v. Lone Star Gas Co.*, 977 F.2d 161, 162 (5th Cir.1992); *Gadson v. Concord Hosp.*, 966 F.2d 32, 35 (1st Cir.1992)). Additionally, appellant's other alleged evidence of U.B.'s hiring practices, including a 2005 article in the University of Virginia School of Law's Journal of Law and Social Policy, which based its statistics on data from law schools in Massachusetts, Ohio, and Texas, and a 2011 article in the

National Law Journal. These are not probative evidence of age discrimination for this case.

On the record before us, we conclude that U.B. has presented a legitimate, nondiscriminatory reason for its refusal to hire appellant. Appellant further failed to adduce sufficient evidence to meet his burden of establishing that U.B.'s reasons were pretextual, and its motive was discriminatory. Additionally, appellant did not establish that U.B.'s hiring practices had a disparate impact on applicants over the age of forty. For the foregoing reasons, we affirm the granting of summary judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**