REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2670

September Term, 2012

PHILIP ROYCE MAY, ET AL.

v.

AIR & LIQUID SYSTEMS CORPORATION
ETC. ET AL.

Woodward,
Kehoe,
Arthur,

JJ.

Opinion by Arthur, J.

Filed: October 3, 2014

In *Ford Motor Co. v. Wood*, 119 Md. App. 1, 34, *cert. denied*, 394 Md. 494 (1998), this Court held that an automobile manufacturer could not be held liable in tort for failing to warn of the latent dangers of asbestos-containing replacement parts that it neither manufactured nor placed into the stream of commerce. In this case, we reaffirm that decision and, in accordance with a number of out-of-state cases that have followed in its wake, hold that the manufacturers of steam pumps in Navy ships cannot be held liable for failing to warn of the dangers of asbestos-containing replacement parts (gaskets and packing) that they neither manufactured nor placed into the stream of commerce.

## QUESTION PRESENTED

Appellants present two questions for our review, which we rephrase and combine below into one question:

> Did the trial court err in granting summary judgment as to whether defendants had a duty to warn of the hazards associated with replacement parts for the products they sold?[1]

For the reasons that follow, we answer no and affirm the judgment of the circuit court.

---

[1]The original questions are:

1) Whether the circuit court committed reversible error in granting defendants' motions for summary judgment on the issue of a legal duty to warn in consideration of outstanding preliminary, factual determinations.

2) Whether the circuit court committed reversible error in holding that defendant pump manufacturers had no duty to warn of the hazards associated with asbestos parts they designed, integrated, and required for use in their equipment.

**FACTUAL AND PROCEDURAL HISTORY**

Plaintiff Philip Royce May served on active duty in the United States Navy for 20 years, from 1956 until 1976. For almost all of those 20 years, Mr. May worked as a machinist mate in one of the several engine rooms of a naval vessel. As a machinist mate, Mr. May's duties included replacing asbestos gaskets and "packing" in the pumps that pumped superheated steam through the ship's steam-propulsion system.[2]

Mr. May's work exposed him to airborne asbestos fibers. When removing gaskets, Mr. May would have to use a hand-held scraper, a wire brush, or a pneumatic brush, which generated respirable dust. When fabricating a new gasket for installation, Mr. May would have to shape it into the proper size, which also generated respirable dust. When removing packing, Mr. May would have to get within two inches of a valve to blow out the last pieces of packing, which generated respirable dust as well.

Defendants Air & Liquid Systems Corp., Warren Pumps LLC, and IMO Industries, Inc., manufactured the steam pumps whose gaskets and packing Mr. May would replace. In accordance with the Navy's specifications, the defendants' pumps contained asbestos gaskets and packing when the defendants first delivered them to the Navy.

During Mr. May's career, he served on a total of seven ships, all of which were built and launched at least five years before his service on them began. Indeed, six of the

---

[2]Gaskets are mechanical seals that prevent the leakage of gas or fluids from valves. Packing is inserted between a valve stem and a valve cover (or bonnet) to maintain a seal.

seven were built and launched during World War II, more than a decade before Mr. May joined the Navy. As Mr. May testified in his deposition, he never served on the maiden voyage of any navy vessel.

Because Mr. May never served on a maiden voyage, he was never the first mechanic to perform maintenance on any of those pumps and to replace the original gaskets or packing in them. In fact, the pumps in question had been serviced on many occasions before he worked on any of them. Thus, Mr. May was not exposed to any asbestos-containing products that had been made or sold by any of the defendant-manufacturers. Instead, he was exposed to asbestos-containing replacement parts that were made and sold by entities other than the defendant-manufacturers.

The defendant-manufacturers neither required nor recommended that any particular replacement part be used. In other words, the defendants neither required nor recommended the use of their own products as replacement parts, nor did they require or recommend the use of asbestos-containing replacement parts. In fact, when Mr. May needed a replacement part, he obtained it by referring to a Navy stock number. He did not request or obtain a specific part that was manufactured by a specific manufacturer.

Finally, the defendant-manufacturers did not instruct or advise Mr. May about how to make and change gaskets (in, for example, their product manuals). While Mr. May consulted "instruction books from the manufacturer" (it was not clear whose), he did so

only to learn how much clearance was required and how thick the gasket should be.[3]

In January 2012, Mr. May learned that he was suffering from malignant pleural mesothelioma, a rare form of cancer that is commonly caused by asbestos exposure. On March 2, 2012, he and his wife filed suit in the Circuit Court for Baltimore City, naming numerous defendants, including the manufacturers of the steam pumps on the ships on which he served.[4]

At the close of discovery, those manufacturers moved for summary judgment on the ground that, as a matter of Maryland law, they had no duty to warn of the dangers of the asbestos-containing replacement parts that they neither manufactured nor placed into the stream of commerce. The circuit court granted the motions. After the denial of their motions for reconsideration, the Mays noted a timely appeal.

## STANDARD OF REVIEW

For motions for summary judgment, the applicable legal standards are well known: under Rule 2-501(f), "a court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter

---

[3]Mr. May takes liberties with the record, asserting, for example, that the defendant-manufacturers' manuals instructed him to remove used gaskets in an unsafe manner and "mandate[d]" and "required" the use of asbestos-containing replacement parts. Suffice it to say that the record does not support his assertions.

[4]Other defendants included the manufacturers of the asbestos-containing replacement parts that Mr. May replaced and installed. The Mays have resolved their claims against those defendants.

of law."

"[T]he summary judgment standard is akin to that of a directed verdict, *i.e.*, whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md. App. 236, 244 (1992); *accord Sierra Club v. Dominion Cove Point LNG, L.P.*, 216 Md. App. 322, 330, *cert. denied*, ___ Md. ___ (June 19, 2014). Thus, a court must view the facts, and all reasonable inferences that may be drawn from them, in the light most favorable to the non-moving party. *Dobkin v. Univ. of Baltimore Sch. of Law*, 210 Md. App. 580, 590-91 (2013). Nonetheless, when a movant has carried its burden of demonstrating sufficient grounds for summary judgment, "'the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.'" *Hamilton v. Dackman*, 213 Md. App. 589, 606 (2013) (quoting *Seaboard Sur. Co.*, 91 Md. App. at 244).

In reviewing the grant of a motion for summary judgment, appellate courts focus on whether the circuit court's grant of the motion was legally correct. *Sierra Club*, 216 Md. App. at 330 (citing *Laing v. Volkswagen of Am., Inc.*, 180 Md. App. 136, 152-53 (2008)). Thus, we conduct a plenary, *de novo* review of the grant of summary judgment. *See*, *e.g.*, *Reiner v. Ehrlich*, 212 Md. App. 142, 151, *cert. denied*, 433 Md. 514 (2013); *Dobkin*, 210 Md. App. at 590-91.

DISCUSSION

**A.**   *Wood* **Is Dispositive of the Mays' Claims**

This case is governed by the decision *Ford Motor Co. v. Wood*, 119 Md. App. 1, *cert. denied*, 394 Md. 494 (1998).[5]

In *Wood*, Mrs. Wood claimed that her late husband had contracted mesothelioma and died because he had been exposed to asbestos fibers while working in a garage where workers repaired and replaced the brakes and clutches on older-model Ford trucks. *Id.* at 10, 30. Although she had prevailed at trial, this Court held that the circuit court erred in denying Ford's motion for judgment, because Mrs. Wood "did not present sufficient evidence that Mr. Wood was exposed to Ford's brake and clutch products with the requisite degree of frequency, proximity or regularity." *Id.* at 30. In reaching its decision, the *Wood* Court reasoned that the trucks "did not contain their original brake and clutch parts" during the period when Mr. Wood worked at the garage (*id.*) and that Mrs. Wood had insufficient evidence of the extent to which the garage had used Ford products as the replacement parts. *Id.* at 30-33. For that reason, this Court concluded that "the evidence simply was too thin to demonstrate that Mr. Wood frequently and regularly worked in

---

[5]In *John Crane, Inc. v. Scribner*, 369 Md. 369 (2002), the Court of Appeals abrogated *Wood* to the limited extent that it had held that the trial judge, rather than the jury, would decide a factual question about whether a plaintiff's claim arose before or after July 1, 1986, and thus whether the claim was or was not subject to the cap on noneconomic damages in Md. Code (1973, 2011 Repl. Vol.), § 11-108 of the Courts and Judicial Proceedings Article. Except to that limited extent, *Wood* remains good law.

proximity to mechanics applying Ford brake and clutch products." *Id.* at 33.

As an alternative ground to uphold the verdict, Mrs. Wood argued that Ford had a duty to warn of the dangers involved in replacing the asbestos-containing brakes and clutches on its vehicles, regardless of who manufactured the replacement parts. *Id*. This Court rejected that argument, first, because Mrs. Wood had not tried the case on that theory (and thus because Ford had not had the opportunity to defend the case on that theory). *Id.* Nonetheless, this Court went on to state that even if Mrs. Wood had proceeded on her alternative theory, Ford would have no liability for replacement or component parts that it neither manufactured nor placed into the stream of commerce. *Id.* at 34.

Surveying the state of the law in 1998, this Court observed that a manufacturer could be held liable for defective component parts manufactured by another person only if the manufacturer incorporated the defective part into its finished product. *Id.* (citing *Baughman v. Gen. Motors Corp.*, 780 F.2d 1131, 1132 (4th Cir. 1986); *Exxon Shipping Co. v. Pac. Res., Inc.*, 789 F. Supp. 1521, 1527 (D. Haw. 1991); *Comstock v. Gen. Motors Corp.*, 358 Mich. 163 (1959)). This concept of "assembler's liability" is justified, this Court said, because the assembler "derives an economic benefit from the sale of the product that incorporates the component; the assembler has the ability to test and inspect the component when it is within its possession; and, by including the component in its finished product, the assembler represents to the consumer and ultimate user that the

component is safe." *Wood*, 119 Md. App. at 34 (citing *Baughman*, 780 F.2d at 1132-33; *Exxon Shipping*, 789 F. Supp. at 1527).

On the other hand, this Court observed that other courts had refused to hold manufacturers liable for component parts that they did not market or place into the stream of commerce. Instead, those courts had imposed liability only on the entities in the chain of distribution for the defective part (*Wood*, 119 Md. App. at 34-35), including defective replacement parts. *Id.* at 35 (citing *Exxon Shipping*, 789 F. Supp. at 1527; *Newman v. Gen. Motors Corp.*, 524 So.2d 207, 209 (La. App. 1988)). This Court remarked that it was "not only equitable" to limit liability to those in the chain of distribution, but doing so would also "preserve[] a bright line in the law of strict liability." *Wood*, 119 Md. App. at 35. As a consequence, this Court refused to hold that a manufacturer "has a duty to warn of the dangers of a product that it did not manufacture, market, sell, or otherwise place into the stream of commerce." *Id.* at 37; *see id.* at 39.

*Wood* is dispositive of this case for the simple reason that the Mays had no evidence that any of the defendant-manufacturers manufactured, marketed, sold, or otherwise placed into the stream of commerce any of the asbestos-containing gaskets or packing to which Mr. May was exposed. It was undisputed that Mr. May was exposed to asbestos only because of his exposure to replacement parts that the manufacturer-defendants neither made nor placed into the stream of commerce. The circuit court, therefore, correctly directed the entry of summary judgment in favor of those defendants

and against the Mays.[6]

**B.      The Controlling Statements in *Wood* Are Not Dicta**

The Mays, who did not cite *Wood* until page 22 of their 29-page brief, dismiss *Wood*'s lengthy discussion of liability for defective replacement or component parts, terming it mere dicta.  We disagree.

At the outset of the opinion, when the *Wood* Court set out the questions presented in the appeal, it remarked that Mrs. Wood's arguments "raise[d] the novel question of whether Ford can be held liable for failure to warn of the latent dangers of asbestos-containing brake and clutch products that it neither manufactured nor placed into the stream of commerce." *Id.* at 9.  This Court proceeded to answer that question, which Mrs. Wood herself had put forth as an alternate ground to uphold the verdict in her favor. This Court's answer was, therefore, an alternative holding, and not mere dicta.  *See State v. Bd. of Educ. of Montgomery County*, 346 Md. 633, 641 (1997) ("[a]n appellate court's rejection of a reason given by a litigant for the relief sought in the case is not 'dicta'").

**C.      Since *Wood*, Cases From Across the Country Have Almost Uniformly Rejected the Mays' Position**

In any event, in the 16 years since this Court decided *Wood*, numerous courts

---

[6]The Mays argue that even if *Wood* forecloses their ability to assert a strict liability claim based on a failure to warn, it does not foreclose a negligent failure to warn claim. They are incorrect.  *See id.* at 36 n.7 ("regardless of whether Ford's duty to warn sounds in negligence or strict liability, it has a duty to warn only by virtue of its manufacture or sale of unreasonably dangerous products").

around the country have either followed *Wood* or have applied the same line of reasoning to hold that a manufacturer generally has no liability for defective replacement or component parts that it did not manufacture or place in the stream of commerce. *O'Neil v. Crane Co.*, 53 Cal. 4th 335, 342, 362 (2012); *Simonetta v. Viad Corp.*, 165 Wash. 2d 341, 354, 363 (2008); *Braaten v. Saberhagen Holdings*, 165 Wash. 2d 373, 396 (2008); *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 496 (6th Cir. 2005); *Faddish v. Buffalo Pumps*, 881 F. Supp. 2d 1361, 1371 (S.D. Fla. 2012); *Conner v. Alfa Laval, Inc.*, 842 F. Supp. 2d 791, 801 (E.D. Pa. 2012); *Surre v. Foster Wheeler LLC*, 831 F. Supp. 2d 797, 801 (S.D.N.Y. 2011).

Notably, a number of courts reached that conclusion in cases that present the precise issue in this case – whether a naval pump-manufacturer is liable for damages caused by asbestos-containing replacement parts (such as gaskets, packing, or insulation) that it neither manufactured nor placed in the stream of commerce. Almost uniformly, the courts have held that the manufacturer has no such liability. *O'Neil*, 53 Cal. 4th at 342, 362; *Braaten*, 165 Wash. App. at 396; *Lindstrom*, 424 F.3d at 496; *Faddish*, 881 F. Supp. 2d at 1372; *Conner*, 842 F. Supp. 2d at 801; *but see Hughes v. A.W. Chesterton Co.*, 435 N.J. Super. 326, 340-41, 89 A.3d 179, 187-88 (N.J. App. Div. 2014); *Berkowitz v. A.C. & S., Inc.*, 288 A.D.2d 148, 149, 733 N.Y.S.2d 410, 412 (N.Y. App. Div. 2001).

In *Braaten*, 165 Wash. 2d at 386, the Supreme Court of Washington asserted that "the policy underpinnings for strict liability . . . do not apply when a manufacturer has not

placed the product in the stream of commerce." Those underpinnings are enumerated in

comment c to § 402A of the Restatement (Second) of Torts (1965), upon which strict

products liability is predicated. *See, e.g., Phipps v. Gen. Motors Corp.*, 278 Md. 337, 353

(1976). According to comment c:

> On whatever theory, the justification for the strict liability has been said to be that *the seller*, by marketing his product for use and consumption, *has undertaken and assumed a special responsibility* toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, *that reputable sellers will stand behind their goods*; that public policy demands *that the burden of accidental injuries* caused by products intended for consumption *be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained*; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and *the proper persons to afford it are those who market the products*.

Restatement (Second) of Torts, *supra*, cmt. c (emphasis added); *accord Faddish*, 881 F.

Supp. 2d at 1369 ("[t]he rationale underpinning the general rule of strict liability is that it

logically and fairly places the loss caused by a defective product on those who create the

risk and reap the profit by placing such a product in the stream of commerce, with the

expectation that those entities have the greatest incentive and resources to control and

spread the risk of harm posed by the product").[7]

In this case, the defendant-manufacturers "did not manufacture, sell, or otherwise

---

[7]Although these cases talk in terms of the policies underlying strict liability, Maryland courts have recognized that "negligence concepts and those of strict liability have 'morphed together,' . . . in failure to warn cases." *Gourdine v. Crews*, 405 Md. 722, 743 (2008).

distribute the replacement packing and gaskets" to which Mr. May was exposed. *Braaten*, 165 Wash. App. at 392. For that reason, the manufacturers could not "treat the burden of accidental injury caused by asbestos in the replacement products as a cost of production against which liability insurance could be obtained." *Id.* "Thus, the policies that support imposition of strict liability are inapplicable in this case." *Id.*; *accord O'Neil*, 53 Cal. 4th at 349 (quoting *Peterson v. Superior Court*, 10 Cal. 4th 1185, 1199 (1995)) (refusing to impose liability on "those outside the marketing enterprise" because they "'cannot exert pressure upon the manufacturer to make the product safe and cannot share with the manufacturer the cost of insuring the safety' of the product's user"); *O'Neil*, 53 Cal. 4th at 363 (terming it "unfair" to require manufacturers "to shoulder a burden of liability when they derived no economic benefit from the sale of the products that injured the plaintiff"); *Faddish*, 881 F. Supp. 2d at 1374 (refusing to impose liability on pump manufacturers that "had no control over the type of insulation the Navy would choose and derived no revenue from sale of [the] asbestos-containing products" that injured the plaintiff").[8]

---

[8] In *Macias v. Saberhagen Holdings, Inc.*, 175 Wash. 2d 402, 416 (2012), the Supreme Court of Washington distinguished *Braaten* in holding that a respirator manufacturer had a duty to warn of the inherent risk of exposure to asbestos particles when a user cleans the respirator's filter. Similarly, in *Shields v. Hennessy Indus., Inc.*, 205 Cal. App. 4th 782, 797 (2012), a California appellate court distinguished *O'Neil* in reversing a judgment on the pleadings in favor of the manufacturer of a brakeshoe grinder whose product inevitably caused asbestos fibers to become airborne and respirable. These cases do not, however, help the Mays, because they do not concern liability for

(continued...)

Accordingly, we agree with the Washington, California, and federal courts that have held that, under the principles underpinning strict products liability, the defendant-manufacturers had no duty to warn of the hazards associated with asbestos-containing replacement parts that they neither manufactured nor introduced into the stream of commerce. Even if *Wood* had never been decided, the circuit court would not have erred in directing the entry of summary judgment against the Mays.[9]

**D. The Manufacturers Had No Duty to Warn Notwithstanding the Alleged Foreseeability of Harm**

In advocating for a contrary conclusion, the Mays argue that the defendant-manufacturers had a duty to warn because it was "foreseeable" that those parts would be incorporated into the defendants' pumps. Under Maryland law, however, foreseeability "'alone does not suffice to establish a duty.'" *See, e.g.*, *Gourdine v. Crews*, 405 Md. 722,

---

[8](...continued)
replacement parts that the manufacturers neither made nor sold; rather they concern liability for defects in the manufacturers' own products when they were being used as they were intended to be used.

[9]Had the Mays come forward with evidence that the manufacturers "specified or required" the use of asbestos-containing replacement parts (in their manuals, for example), they might have had a stronger argument for liability. *See O'Neil*, 53 Cal. 4th at 350 n.6; *but see Wood*, 119 Md. App. at 33 (dismissing language in manuals, "indicating the importance of using Ford replacement parts," as "nothing more than a marketing message"). Even then, however, the Mays would have been required to overcome the policy rationale for holding a manufacturer liable only for products that it manufactured or delivered into the stream of commerce. *See O'Neil*, 53 Cal. 4th at 350 n.6. Nonetheless, we need not (and do not) address that difficult issue in this case, because the Mays had no evidence that the defendant-manufacturers specified or required the use of asbestos-containing replacement parts in the pumps on which Mr. May worked.

746 (2008) (quoting *Patton v. USA Rugby Football*, 381 Md. 627, 637 (2004)).

To the contrary, even when a person's conduct could foreseeably result in harm to others, the Court of Appeals has repeatedly refused to recognize a duty in tort if it would expose a person to liability to "an indeterminate class of people." *See, e.g.*, *Gourdine*, 405 Md. at 750 (despite the foreseeability of harm*,* a drug manufacturer had no duty to a person who was killed by a driver who had a blackout because of defective warnings in the manufacturer's product); *see also Doe v. Pharmacia & Upjohn, Inc*., 388 Md. 407, 421 (2005) (despite the foreseeability of injury, an employer had no duty to the wife of an employee who contracted HIV through his work as a laboratory technician; the proposed duty "would create an indeterminate class of potential plaintiffs" because it would run not only to all sexual partners of all employees, but to anyone who could have contracted HIV from the employee by any means); *Dehn v. Edgecombe*, 384 Md. 606, 626-27 (2005) (despite the foreseeability of injury, a physician had no duty to the wife of a patient to whom the physician provided negligent post-operative care for a vasectomy; the imposition of a duty would "expand traditional tort concepts beyond manageable bounds" because the "rationale for extending the duty would apply" not just to the wife, but "to all potential sexual partners").

In this case, the foreseeability of harm is neither dispositive nor even material to the existence of a duty, which is typically a question of law for the court. *See, e.g., Remsburg v. Montgomery*, 376 Md. 568, 581 (2003). In *Wood*, this Court held that Ford

had no duty to warn of the hazards associated with asbestos-containing replacement brakes and clutches that others had made or sold, however foreseeable it may have been that mechanics and others might be exposed to asbestos fibers from those replacement parts. Under the controlling authority of *Wood*, therefore, the defendant-manufacturers in this case likewise had no duty to warn of the hazards associated with replacement parts that they neither manufactured nor introduced into the stream of commerce.[10]

In this regard, we note that, in cases identical to this one, other courts have flatly rejected the argument that a pump manufacturer had a duty to warn of the hazards of asbestos-containing replacement parts because it was "foreseeable" that those parts would be incorporated into the defendants' pumps. *O'Neil*, 53 Cal. 4th at 362 ("the foreseeability of harm, standing alone, is not a sufficient basis for imposing strict liability on the manufacturers of a nondefective product, or one whose arguably defective product does not actually cause harm"); *Faddish*, 881 F. Supp. 2d at 1371 ("a manufacturer's duty to warn, whether premised in negligence or strict liability theory, generally does not extend to hazards arising exclusively from *other* manufacturer's products, regardless of the foreseeability of the combined use and attendant risk") (emphasis in original); *see also Braaten*, 165 Wash. 2d at 391 (it "makes no difference" that a manufacturer allegedly

---

[10]In support of their arguments concerning foreseeability, the Mays cite *Moran v. Fabergé, Inc.*, 273 Md. 538 (1975), which held that a manufacturer had a duty to warn about the risks arising from the foreseeable use (or misuse) of its own product. Neither *Moran*, nor any other Maryland case, purports to require a manufacturer to warn about the risks of a product that it did not make or sell.

knew that the replacement parts "would or might contain asbestos"). We agree with the courts that have held that, despite the alleged foreseeability of harm from defective replacement parts that are made or manufactured by others, a person generally is liable only for harm caused by products that it manufactured or otherwise introduced into the stream of commerce.

In the face of that considerable body of law that rejects their argument on foreseeability, the Mays cite only one case concerning a pump manufacturer's duty to warn of the hazards of defective replacement parts that it did not make or sell – *Berkowitz v. A.C. & S, Inc.*, 288 A.D.2d 148, 733 N.Y.S.2d 410 (N.Y. App. Div. 2001), a summary opinion that affirms the denial of a manufacturer's motion for summary judgment. The United States District Court for the Southern District of New York accurately described *Berkowitz* as "a one-paragraph opinion with no clear holding." *Surre v. Foster Wheeler LLC*, 831 F. Supp. 2d 797, 802 (S.D.N.Y. 2011). We find *Berkowitz* thoroughly unpersuasive and decline to follow it.[11]

---

[11]In a case that was decided after briefing was completed in this appeal, the Appellate Division of the Superior Court of New Jersey held that under New Jersey law a pump manufacturer had a duty to warn about the hazards of asbestos-containing replacement parts because, the court said, "it was reasonably foreseeable, at the time the pumps were placed in the marketplace, that gaskets and packing would be replaced regularly with gaskets and packing that contained asbestos." *Hughes v. A.W. Chesterton Co.*, 435 N.J. Super. 326, 341, 89 A.3d 179, 188 (N.J. App. Div. 2014). We find *Hughes* unpersuasive as well, because it fails to cite, much less to discuss or distinguish, any of the many decisions that are at odds with its conclusion (including this Court's decision in *Wood*).

**E.  The Mays' Miscellaneous Arguments Are Unavailing**

Although their position is foreclosed both by *Wood* and by the out-of-state cases

that have followed in its wake, the Mays make a series of miscellaneous arguments.  We

reject each of them.

First, citing *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 446-47 (1992), the Mays

argue that the defendant-manufacturers had a continuing duty to warn after the sale of

their products.  *Zenobia*, however, concerns a continuing duty to warn only about the

dangers of the manufacturer's own product.  Nothing in *Zenobia* imposes a duty to warn

about the hazards of another person's product, or of replacement parts that might be

installed in the manufacturer's product.  *Accord Scapa Dryer Fabrics, Inc. v. Saville*, 418

Md. 496, 510 (2011) (quoting *Lee v. Baxter Healthcare Corp.*, 721 F. Supp. 89, 93 (D.

Md. 1989)) (stating that Maryland "requires the plaintiff to prove that the defendant

manufactured the product which allegedly caused the injury").  It is impossible to impose

a "continuing" duty to warn on someone who had no duty to warn in the first place.

Second, in their reply brief, the Mays (improperly) raised a new argument[12] based

on Md. Code (1973, 2011 Repl. Vol.), § 5-115 of the Courts and Judicial Proceedings

---

[12]The argument is improper because it does not respond to the points and issues in the manufacturers' briefs (*Federal Land Bank of Baltimore, Inc. v. Esham*, 43 Md. App. 446, 459 (1979)), and because the Mays do not appear to have raised it in the circuit court.  *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court").

Article, a statute that generally provides that if limitations or laches would bar a products

liability claim in the jurisdiction in which the claim arose, the claim would be barred in

Maryland as well unless the plaintiff is a Maryland resident.[13]  Although § 5-115 has little

obvious relevance to this case, the Mays find it to be significant because of its definitions

of a "manufacturer" ("a designer, assembler, fabricator, constructor, compounder,

producer, or processor of a product *or its component parts*")[14] and a "product" ("a

tangible article, including attachments, accessories, *and component parts*, and

accompanying labels, *warnings*, instructions, and packaging").[15]  The Mays, however, do

not explain why a manufacturer includes a "designer, assembler, fabricator, constructor,

compounder, producer, or processor of . . . component parts" that the alleged

manufacturer did not itself design, assemble, fabricate, construct, compound, produce, or

process.  Nor do they explain why a "product" includes "component parts" or "warnings"

other than those provided by the initial "manufacturer."  Their attenuated argument comes

nowhere close to establishing that under Maryland law a "manufacturer" has a duty in tort

---

[13] Section 5-115(b) specifically provides that, "If a cause of action against a manufacturer or seller of a product for personal injury allegedly caused by a defective product arose in a foreign jurisdiction and by the laws of that jurisdiction the cause of action may not be maintained by reason of a lapse of time, an action may not be maintained in this State, except in favor of one who is a resident of this State."

[14] Md. Code (1973, 2011 Repl. Vol.), § 5-115(a)(3) of the Courts and Judicial Proceedings Article (emphasis added).

[15] Md. Code (1973, 2011 Repl. Vol.), § 5-115(a)(3) of the Courts and Judicial Proceedings Article (emphasis added).

to warn of the latent dangers associated with replacement parts that it neither manufactured nor placed into the stream of commerce.

Finally, in another new argument that they improperly raised for the first time in their reply brief, the Mays appear to assert that the steam pumps themselves were defective because they operated at high temperatures, which caused the gaskets and packing to degrade, which then required sailors (such as Mr. May) to remove the gaskets and packing in a process that exposed them to respirable asbestos fibers. The Supreme Court of California cogently rebutted a similar argument in *O'Neil*:

> [A] high operating temperature was unavoidable given the intended use of these pumps and valves. Because transferring heat was integral to the products' functioning, it cannot be labeled a "defect."

*O'Neil*, 53 Cal. 4th at 350.

We agree with the California court. Accordingly, we reject the Mays' final argument for reversal.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS**.