*Melissa Candolfi v. Allterra Group, LLC*, Case No. 481, September Term 2021.
Opinion by Nazarian, J.

**CONTEMPT — DIRECT CIVIL CONTEMPT — NATURE OF VALID PURGE PROVISION**

Direct civil contempt must be used to coerce present or future compliance with a court order rather than punish past, completed conduct. Essential to a court's imposition of civil contempt is the person's ability to purge the contempt to avoid a sanction. To serve the coercive purpose of civil contempt, the sanction must be distinct from the purge provision and the valid legal requirement the court seeks to enforce.

Circuit Court for Worcester County
Case No. C-23-CV-20-000113

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 481

September Term, 2021

_____

MELISSA CANDOLFI

v.

ALLTERRA GROUP, LLC

_____

Nazarian,
Leahy,
Harrell, Glenn T., Jr.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  March 30, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal challenges an order granting summary judgment on a wrongful discharge complaint and an order of direct civil contempt. Melissa Candolfi alleged that her employer, Allterra Group, LLC ("Allterra"), terminated her wrongfully upon learning that she was pregnant, in violation of public policy. The Circuit Court for Worcester County found that Ms. Candolfi had failed to produce evidence of Allterra's discriminatory intent and granted Allterra's motion for summary judgment. In doing so, the trial court refused to consider Ms. Candolfi's untimely response to Allterra's summary judgment motion and her unsigned affidavit that accompanied it. The court also found Ms. Candolfi's attorney, Ryan West, in direct civil contempt after he failed to appear at the hearing on the summary judgment motion. Ms. Candolfi and Mr. West appeal, and we affirm the summary judgment and reverse the order of direct civil contempt.

## I. BACKGROUND

We view the facts in the light most favorable to the underlying plaintiff, Ms. Candolfi, the non-moving party at summary judgment. *Kennedy Krieger Inst., Inc. v. Partlow*, 460 Md. 607, 632 (2018) (*citing Chateau Foghorn LP v. Hosford*, 455 Md. 462, 482 (2017)).

Allterra is a real property appraisal business based in Ocean City. Allterra hired Ms. Candolfi as a Marketing Director on January 2, 2018 at an initial salary of $36,000 per year. Joan Trice, Allterra's CEO, called Ms. Candolfi to offer her the job. The offer letter from Ms. Trice that followed stated that Allterra "is an employer at will and continuation of employment . . . is dependent upon the attainment and maintenance of satisfactory performance." The letter also stated that Ms. Candolfi would report directly to Ms. Trice

and would be "responsible for developing and managing the Allterra Group marketing efforts which include marketing plans for Valuation Expo; editing and management of our online newsletter; social media campaigns; and editing of our print magazines."

Ms. Candolfi insists that she only agreed to the $36,000 salary because "it was understood and agreed upon that it was a full-time remote position . . . ." Allterra contends that Ms. Candolfi requested a salary of $42,000 and that Allterra "intended to consider raising her to $42,000.00 after six months, depending on performance." In any event, Ms. Candolfi received a raise of $2,500.00 in or about July 2018. She also received bonuses of $500 each in March 2018 and December 2018 after working on-site at Valuation Expos. The parties dispute whether the raise and bonuses were the result of satisfactory performance.

Ms. Candolfi announced on a group call on January 14, 2019 that she was pregnant. She followed up with an email to Ms. Trice on January 28, who acknowledged the pregnancy positively and referenced the "growing Allterra family[.]" But things took a turn shortly after, when on February 8, 2019, Ms. Candolfi underwent her one-year performance review with Allterra's Chief Operating Officer, Crispin Bennett. Ms. Candolfi received a copy of a written "Employee Review" showing several areas that needed improvement. She met or exceeded expectations in three out of seven categories but was rated "Some Improvement Needed" in the remaining four, including "Editing Content," "Social Media Marketing," "Promotion of Valuation Expo," and "Special Edition and Advertising Messages." As a result, Allterra asked Ms. Candolfi to make cold calls to potential Valuation Expo attendees, to develop a LinkedIn page, and most importantly, to "report to

2

the office . . . and [] work from 9-5 each day from the office until such a time as improvements are made and the improved level of work is well documented, and permission is given by Crispin[.]"

After giving her the one-year review, Mr. Bennett emailed Ms. Candolfi and asked her to sign the Employee Review and send it back. She refused. She pointed to circumstances out of her control that made the Valuation Expo harder to market, but mostly challenged the requirement that she work at the office in person:

> Upon acceptance of this position, it was understood and agreed upon that it was a full-time remote position and thus the reasoning during the salary negotiation process. I have gone into the office when necessary or when would benefit the company's initiatives. In addition, to the request of my presence in the office on Mondays. If it is now required of me to be in the office full time, I would like to re-evaluate my current agreement.

Mr. Bennett responded that "working out of the office right now is to help you. We can re-evaluate once things are on track . . . ." Ms. Candolfi refused to sign the document "until there is an addendum explaining the new agreement based on my presence in the office full time. . . . [I]t does not appear to be a temporary situation." She added in another email that the Employee Review "[c]learly states the change in my position and requirements. Based on that, I will not be signing the document until there is [] an updated contract. By signing this document, it will show that I agree with these changes and I do not."

Ms. Candolfi followed up later in an email to Ms. Trice and Mr. Bennett that she thought the Employee Review was a "poor representation of my performance." She contended that several factors affected the marketing of the Valuation Expo, but again was

most concerned about her remote status and requested clarification about whether she would be required in the office temporarily or permanently. She reiterated that she only accepted the job and salary because she understood she was in a remote position, adding that "[i]f the job requirements are now being restructured, I would like to request a re-evaluation of my long-term agreement." She noted that "[m]y direct team members have the same job description as remote, and all live out of state except Jim. The level of interaction does not improve based on my in-office presence without the entire time [sic] present at the same times."

The Employee Manual, which Ms. Candolfi admitted receiving in her deposition, provided that remote work was permitted at the CEO's discretion:

> The alternative work arrangements program is intended to offer work/life flexibility consistent with the business needs of [Allterra]. Success of these arrangements is dependent on strong, consistent communication and strict adherence to policy guidelines. Abuse of the []Companies [sic] alternative work arrangements can result in disciplinary action up to and including termination of employment.
>
> *The ability to work remotely is at the CEO's discretion and will be made on a case-by-case basis.*

(Emphasis added.) The Employee Manual section on "Corrective Action" provides a "progressive approach" to employee discipline:

> The usual sequence of corrective actions includes an oral warning, a written warning, probation, and finally termination of employment. . . . Though committed to a progressive approach to corrective action, Allterra . . . considers certain rule infractions and violations of standards as grounds for immediate termination of employment.

The "rule infractions" include "insubordinate behavior," "disrespectful conduct," and

4

"[u]nsatisfactory performance or conduct."

During her deposition, Ms. Candolfi agreed that promoting the Valuation Expo was a "basic function[]" of her job as Marketing Director. She acknowledged that the Employee Review was accurate when it stated that they "currently[] ha[d] the lowest rate of attendees in history for the Upcoming Chicago Val Expo." And she testified that she was willing to sign the Employee Review only "if there was clarification" about whether her coming into the office was "temporary or permanent." There never was any such clarification, though, and Allterra ultimately terminated her employment.

During discovery, Allterra learned that throughout her employment, Ms. Candolfi worked three other jobs. She operated a wedding planning business, walked dogs via a profile on Rover.com, and bartended nights and weekends at an area restaurant. She insisted that these activities did not conflict with her employment obligations to Allterra.

Ms. Candolfi sued Allterra for wrongful discharge and the case was set for trial on May 20, 2021. In its corresponding Scheduling Order, the court required all motions to be filed forty-five days prior to the trial date, April 5, 2021. The trial court's order also authorized discovery until March 20, 2021. After the close of discovery, on March 24, Allterra moved to postpone the trial and convert the trial date to a hearing on its motion for summary judgment, which it filed the following day. On April 4, 2021, the trial court granted Allterra's motion to postpone the trial date. No new trial date was set, but the court ordered the parties to appear for a hearing on Allterra's summary judgment motion on May 20, 2021.

On May 11, 2021, Ms. Candolfi's counsel, Mr. West, filed a motion to continue the

5

summary judgment hearing:

> Because the trial date was postponed, Plaintiff's undersigned Counsel removed the May 20, 2021 trial date from his calendar. Shortly thereafter, and before Defendant's Request for a Motions Hearing, the undersigned Counsel agreed to attend a doctor appointment for his one year old son, which requires travel across the Chesapeake Bay bridge. . . . At this point, rescheduling the doctor appointment could take six months or more, leaving our son without critical medical treatment if the tests scheduled for May 20th are delayed.

He concluded his filing by stating that the court "must postpone" the motions hearing:

> WHEREFORE, Plaintiff's undersigned Attorney will not be available on a professional level and will not attend any proceedings in this matter on May 20th or May 21st, and Plaintiff's case will not be jeopardized or prejudiced because of the undersigned's personal life threatening medical issues that neither this Honorable Court nor Defendant will take precedence over; the Court must postpone the Motions Hearing for good cause shown, to a date sometime in the future.

Allterra filed a response correcting Mr. West's factual errors as to the scheduling of the May 20 motions hearing, but did not object to a continuation, and requested a hearing date of June 4, 2021.

On May 14, the trial court entered an order reiterating that its April 6 order postponed the May 20 jury trial and set a hearing on the same date. Importantly, the court found Mr. West's language in Ms. Candolfi's motion "demonstrat[ed] his apparent willingness to act in contempt of this Court's Order[.]" The court struck Mr. West's motion to continue but stated that it would consider another request:

> that 1) demonstrates Plaintiff's good cause for postponement of the hearing, 2) shows the requisite professionalism, civility, and respect, and 3) complies with the Postponement/Continuance Policy—First Judicial Circuit,

6

> Requirements for Litigants in Making a Request for Postponement, Revised September 28, 2006.

Mr. West did not amend or file a new motion requesting a postponement of the hearing.

When May 20 arrived, Mr. West did not appear for the hearing. The court's law clerk called Mr. West the morning of the hearing, and he stated that he wasn't coming. The court proceeded with the hearing and made the following findings on the record:

> The Court has found Mr. Ryan West in contempt of Court, civil contempt, based on his failure to appear, having been notified of this hearing, having been aware of this hearing, having told the Court in the filing that I struck that he will not appear, and that this Court will not take precedence. And while all of that might be a fine personal sentiment to have, that's just not how the court can operate. If an individual gets to determine and dictate the terms under which they will appear, we will fall into chaos.

The court entered a written contempt order finding Mr. West had committed "direct, civil contempt" and ordering him to "pay a sanction of $2,467.50 to Defense counsel to purge the contempt as compensation for Defense counsel's expenses incurred in preparing for and attending the May 20, 2021 motions hearing in this case . . . ."

On the motion itself, Ms. Candolfi filed a response, along with an unsigned affidavit from Ms. Candolfi, but not until after the due date, and there was no supporting memorandum or exhibits. The court decided that it would not consider either:

> [T]he Court's finding of—or decision not to receive Ms. Candolfi's response to the motion for summary judgment and to not receive the affidavit—the unsigned affidavit that was submitted as an exhibit, that is not a sanction. That is simply a decision of the Court based on the facts of this case. I'm not punishing Ms. Candolfi for Mr. West's failure to appear. That is a decision independent and separate from the sanction which is assigning the attorney's fees to Mr. West personally.

7

The trial court then granted Allterra's motion for summary judgment, ruling: (1) that Ms. Candolfi's response was filed beyond the time allowed under Maryland Rule 2-311(b), (2) that her supporting affidavit was not signed and would not be considered as evidence, and (3) that she had "failed to present sufficient evidence to demonstrate that [Allterra's] proffered legitimate, non-discriminatory reasons for terminating [her] employment were mere pretext for discrimination[.]"The court concluded that there were no genuine disputes as to any material facts.

On May 25, 2021, Ms. Candolfi filed a motion to reconsider, arguing the trial court applied the "incorrect Employment Discrimination Test" "commonly referred to as the *McDonnell Douglas* Test." She argued that she had offered "direct evidence of discriminatory intent" by showing a "Mosaic of Circumstantial Evidence" that eliminates a defendant's ability to obtain summary judgment:

> In this case, the timing between the event in which Plaintiff announces her pregnancy and the adverse employment action taken against her by the Defendant (11 days and at most 16 days) as referenced in Plaintiff's Amended Complaint and in Defendant's own Motion for Summary Judgment, coupled with any one of the following: the performance bonuses given to Plaintiff; . . . the subjective nature of the alleged performance problems and the lack of objective criteria; . . . and numerous other pieces of circumstantial evidence . . . ."[1]

---

[1] This motion contained many other "pieces of circumstantial evidence" that either did not appear in the record or were contradicted by the record and that hadn't been included in her original opposition. These included:

> Defendant's allegation that Plaintiff refused to work in-person in the office when the evidence shows that after the performance review Plaintiff immediately resumed in-office employment; Defendant's allegations that Plaintiff refused to

The trial court disagreed, and ruled that it did not receive sufficient evidence of Allterra's discriminatory intent, including:

> 1) direct evidence of discrimination, 2) a convincing mosaic of circumstantial evidence sufficient to constitute direct evidence of discrimination, 3) evidence of Defendant's discriminatory intent when Defendant pursued adverse employment actions against Plaintiff with a causal link to such adverse employment actions, or 4) that Defendant's proffered legitimate, non-discriminatory reasons for pursuing adverse employment actions against Plaintiff could have been mere pretext for discrimination; and thus, this Court's decision to grant summary judgment in favor of Defendant and against Plaintiff was appropriate.

The trial court also stated that "[i]rrespective of the untimeliness of Plaintiff's motion . . . this Court finds no evidence . . . which would have allowed this Court to find that Plaintiff had demonstrated that they were entitled to judgment as a matter of law."

This appeal followed. We supply additional facts below as needed.

## II.    DISCUSSION

Ms. Candolfi alleges her termination was wrongful and violated Maryland public policy prohibiting pregnancy discrimination. Maryland has recognized a cause of action for wrongful discharge for terminations in violation of public policy, in this case, pregnancy-based discrimination. *See Makovi v. Sherwin-Williams Co.*, 316 Md. 603

---

follow instructions when her deposition testimony shows that Plaintiff complied with every job instruction from the Employer; . . . Defendant's failure to give any reason for termination at termination and then offering several allegations none of which provide a reason for termination; the offer of a severance to Plaintiff to waive any pregnancy discrimination claims; the Employer's admissions contemporaneous with the termination . . . .

9

(1989). On appeal, Ms. Candolfi raises three issues, which we re-frame as follows:[2] *first*, whether the trial court denied Ms. Candolfi's motion for summary judgment properly; *second*, whether the trial court granted summary judgment in favor of Allterra properly; and *third*, whether the trial court committed reversible error in finding Mr. West in direct civil contempt. We affirm the trial court's rulings on the parties' motions for summary judgment and reverse the trial court's order of direct civil contempt.

---

[2] Ms. Candolfi phrased her Questions Presented as follows:

> 1. Was Allterra entitled to judgment as a matter of law?
>
> 2. Did the circuit court err in denying Ms. Candolfi's motion for summary judgment based on untimeliness?
>
> 3. Did the circuit court follow the proper procedures in finding direct civil contempt?

Allterra phrased its Questions Presented as follows:

> I. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN GRANTING SUMMARY JUDGMENT IN FAVOR OF ALLTERRA?
>
> II. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR IN DENYING CANDOLFI'S UNTIMELY SUMMARY JUDGMENT MOTION?
>
> III. IS THE TRIAL COURT'S CONTEMPT ORDER AGAINST RYAN WEST PROPERLY BEFORE THIS HONORABLE COURT ON APPEAL?

**A.** **The Circuit Court Denied Ms. Candolfi's Motion For Summary Judgment Properly And Did Not Abuse Its Discretion In Refusing To Consider Ms. Candolfi's Untimely Motion And Affidavit.**

We review the circuit court's ruling on summary judgment "to determine whether any genuine issue of material fact exists and whether the party is entitled to judgment as a matter of law." *Dobkin v. Univ. of Balt. Sch. of Law*, 210 Md. App. 580, 590 (2013) (citation omitted). In reviewing a decision to grant summary judgment, we examine the facts in the light most favorable to the non-moving party. *Muse-Ariyoh v. Bd. of Educ. of Prince George's Cnty.*, 235 Md. App. 221, 235 (2017) (citation omitted). Even an unopposed motion for summary judgment will fail when the filings of the moving party demonstrate a dispute of material fact, as "[i]t is the movant's burden to prove that no such dispute exists, regardless of any opposition." *Thompson v. Balt. Cnty.*, 169 Md. App. 241, 247 (2006) (citation omitted). But when this burden is met, the non-moving party "must present admissible evidence upon which the jury could reasonably find for the plaintiff." *Muse-Ariyoh*, 235 Md. App. at 235. More specifically, the plaintiff "must present legally sufficient direct or circumstantial evidence to establish that the facts are susceptible to more than one permissible inference." *Dobkin*, 210 Md. App. at 590 (citation omitted). "Legally sufficient means that the injured party cannot sustain its burden by offering a mere scintilla of evidence, amounting to no more than surmise, possibility, or conjecture." *Id.* (cleaned up).

Ms. Candolfi argues *first* that the trial court erred by refusing to consider her motion for summary judgment for untimeliness. But the court did rule on her motion, even though she filed it well past the Scheduling Order's motions deadline—the court denied it, in an

11

order dated May 17, 2021.[3]

Ms. Candolfi's summary judgment motion argued that she had established a *prima facie* claim of discrimination and that Allterra had failed "to meet its burden of production to state a legitimate non-discriminatory reason for [Allterra's] adverse employment actions to overcome the presumption of intentional discrimination . . . ." But the motion was not accompanied by any supporting memorandum, exhibits, or proof—it stated only that Allterra failed to establish any genuine issues of material fact. It referenced an affidavit "attached to and incorporated by reference in support of her request for summary judgment," but no affidavit was ever filed. In any event, Ms. Candolfi states on appeal that she relies "solely on the documents and statements included with Allterra Group's motion for summary judgment" and on her deposition to defeat Allterra's motion for summary judgment. The trial court properly considered all the evidence on the record it had before it.

The trial court *did* refuse to consider Ms. Candolfi's opposition to Allterra's motion for summary judgment on the ground that it was untimely. She argues that this constituted reversible error. We review the trial court's refusal to consider an untimely motion for abuse of discretion. *See HI Caliber Auto & Towing, Inc. v. Rockwood Cas. Ins.*, 149 Md. App. 504, 508 (2003). And as the trial court explained at the hearing, it exercised its discretion to not consider the opposition or unsigned affidavit separate and apart from Ms.

---

[3] The trial court could have refused to consider her motion altogether. *See* Md. Rule 2-501(a) ("A motion for summary judgment may not be filed . . . unless permission of the court is granted, after the deadline for dispositive motions specified in the scheduling order entered pursuant to Rule 2-504(b)(1)(E).").

Candolfi's attorney's conduct.

The circuit court did not abuse its discretion in refusing to consider the response or unsigned affidavit that Ms. Candolfi filed after the deadline. Maryland Rule 2-311(b) required her to file any response to Allterra's motion within fifteen days:

> Except as otherwise provided in this section, a party against whom a motion is directed shall file any response within 15 days after being served with the motion, or within the time allowed for a party's original pleading pursuant to Rule 2-321(a), whichever is later. Unless the court orders otherwise, no response need be filed to a motion filed pursuant to Rule 1-204, 2-532, 2-533, or 2-534. If a party fails to file a response required by this section, the court may proceed to rule on the motion.

Ms. Candolfi's only argument, citing Maryland Rule 1-201, is that "[t]he circuit court's actions did not further the purposes of the Rules, which are to be 'construed to secure simplicity in procedure, fairness in administration, and elimination of unjustifiable expense and delay.'" It's hard to understand how untimely motion responses secure simplicity in procedure or eliminate expense and delay, though, and we see no abuse of the circuit court's discretion in its decision not to consider Ms. Candolfi's untimely opposition to Allterra's summary judgment motion.

### B.     The Trial Court Properly Granted Summary Judgment To Allterra In Any Event.

The untimely opposition aside, the court correctly granted summary judgment to Allterra on the merits. Ms. Candolfi argues *next* that Allterra's reasons for firing her are false and could not have actually motivated the decision to discharge her. She points us to *Molesworth v. Brandon*, 341 Md. 621 (1996). But that case, unlike this one, involved direct

evidence of discrimination. *Id.* at 638. In *Molesworth*, the employee testified that she "asked if she was being fired because she is a woman," to which a co-worker replied, "'Yes, that's part of it,'" and her employer "'nodded in agreement and looked away' without verbally responding." *Id.* at 626. The court held that the employer's "nod was a statement by a decisionmaker relating to the decision itself that tends to show discriminatory intent." *Id.* at 641.

This case involves no direct evidence of discrimination, including no direct statements from Allterra from which any reasonable juror could infer discriminatory intent. The only evidence Ms. Candolfi offers is the auspicious, or in her view suspicious, timing of Ms. Candolfi's poor Employee Review vis-à-vis her pregnancy announcement, after she was given bonuses and a six-month salary increase, and her immediate termination in the wake of that review.

When, as here, there is no direct evidence of discrimination, the correct standard is the test outlined in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), where the employee must first make out a *prima facie* case of discrimination. Once a *prima facie* case is established, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802. "[T]he plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 248 (1980).

At the first step, "a *prima facie* case is established when a member of a protected group is discharged under circumstances which, if unexplained, would support an inference

14

that the decision to discharge was 'based upon a consideration of impermissible factors.'"

*Levitz Furniture Corp. v. Prince George's Cnty.*, 72 Md. App. 103, 112 (1987) (*quoting*

*Furnco Constr. Co. v. Waters*, 438 U.S. 567, 577 (1978)). For present purposes, we'll

assume that Ms. Candolfi satisfied this first step by pointing out the coincident timing of

her poor Employee Review and her termination of employment after announcing her

pregnancy. It's true that she was fired less than three weeks after announcing her

pregnancy, but there's no evidence that the timing is anything but a coincidence—the

review happened in the normal course, and the termination decision followed it. It's not

obvious that this is enough, but we'll assume for now that it was.

At the second step, the burden of production shifts to the employer to articulate a

legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* at 112–13

(*citing Burdine*, 450 U.S. at 254–55). Allterra provided one—Ms. Candolfi's performance

problems:

> Her performance problems as documented in her one-year
> review, together with her insubordination following the
> review, her outright refusal to sign the review as instructed, and
> her obvious unwillingness to work from the office rather than
> from her home, were the reasons for her termination. Allterra
> management had suspicions in late 2018 and early 2019 about
> Plaintiff working outside of Allterra, and such work consuming
> too much of her time. This was confirmed following her
> termination and more fully through discovery in this case.

If the defendant carries the burden of production, the presumption raised by the *prima facie*

case is rebutted. *Burdine*, 450 U.S. at 255.

At step three, the burden shifted back to Ms. Candolfi to present evidence that

Allterra's reasons were pretextual. At this stage, "the plaintiff must prove that the proffered

reasons were pretextual or unworthy of credence '*and* that discrimination was the real reason.'" *Belfiore v. Merch. Link, LLC*, 236 Md. App. 32, 46 (2018) (*quoting Hicks*, 609 U.S. at 515). Ms. Candolfi points to three things: *first*, her deposition testimony where she stated, "I felt I was fired for being pregnant," *second*, that "all of the allegations made by Allterra against Ms. Candolfi are inconsistent with Allterra's own Employee Manual, casting doubt on the veracity of the stated reasons for her termination," and *third*, that she provides "a clear explanation to each allegation regarding Ms. Candolfi's job performance, raising . . . suspicion about the real motivation for terminating her."

To survive summary judgment, Ms. Candolfi "'must present substantial evidence to support a reasonable probability, rather than a mere possibility, that her employer discriminated against her . . . .'" *Nerenberg v. RICA of S. Md.*, 131 Md. App. 646, 674 (2000) (*quoting DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir. 1998)). She "'cannot seek to expose'" Allterra's rationale "'as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a "genuine" dispute, the latter would fail to be material.'" *Muse-Ariyoh*, 235 Md. App. at 247 (*quoting Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006); *Holland v. Wash. Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007)).

Her statement, "I felt I was fired for being pregnant," doesn't help her case because "a disgruntled employee's self-serving statements about [her] qualifications and abilities generally are insufficient to raise a question of fact about an employer's honest assessment of that ability." *Williams v. Md. Dep't of Hum. Res.*, 136 Md. App. 153, 174 (2000). From

16

there, she attempts to cast doubt on the Employee Review's correctness, but says nothing of her refusal to sign the Employee Review and her repeated objections to working in-person. She argues that Allterra's actions were inconsistent with its own Employee Manual, but the Employee Manual stated unambiguously that "[t]he ability to work remotely is at the CEO's discretion and will be made on a case-by-case basis." The manual also states that insubordinate behavior (*i.e.*, refusal to sign her Employee Review) can be grounds for immediate termination. Her arguments directed toward the Employee Review are irrelevant to her conduct afterward and don't cast any doubt on Allterra's explanation for her termination. This left nothing to cast doubt on Allterra's explanation, and we agree with the circuit court that summary judgment was appropriate.

**C.    Mr. West Appealed The Trial Court's Direct Civil Contempt Order, And The Trial Court Abused Its Discretion In Imposing A Sanction And Purge That Were The Same.**

Turning to the circuit court's contempt order, we start with Allterra's contention that Mr. West's challenge isn't before us because he didn't file a separate notice of appeal in his own name. Appeals in contempt cases are controlled by Maryland Code (1974, 2020 Repl. Vol.), § 12-304 of the Courts & Judicial Proceedings Article: "Any person may appeal from any order or judgment passed to preserve the power or vindicate the dignity of the court and adjudging him in contempt of court, including an interlocutory order, remedial in nature, adjudging any person in contempt, whether or not a party to the action." At the threshold, then, the contempt judgment against Mr. West was a final, appealable judgment.

"The Maryland Rules do not regulate the content of an order for appeal to the Court of Special Appeals," *Hermina v. Balt. Life Ins.*, 128 Md. App. 568, 576 (1999) (*citing Newman v. Reilly*, 314 Md. 365, 383 (1988) (cleaned up)), and we construe timely notices of appeal liberally. *Id.* at 577. In *Newman*, counsel filed an appeal for separate judgments for sanctions against himself and his client using the following language: "Please enter an appeal on behalf of the Plaintiff to the Court of Special Appeals from the Judgment, in the above captioned matter, in favor of Defendant[.]" 314 Md. at 382. The Court of Appeals noted its "liberal" philosophy of construing Notices of Appeal and reasoned that it didn't want to let the right of appeal be lost by "mistakes of mere form." *Id.* at 386, 387. Likewise, in *Hermina*, the attorney's Notice of Appeal was "as to all rulings made by [the trial court], . . . including those rulings relating to civil contempt in the above captioned case," and was signed:

> Respectfully Submitted,
> The Plaintiff,
> By [*signature*]
> [Plaintiff's Counsel]

128 Md. App. at 575. We found that sufficient:

> [I]f he had merely signed and filed a paper stating, "Please note an appeal to the Court of Special Appeals," the legal effect of that paper would have been to bring up for appellate review the sole appealable judgment in the case. We shall treat the rest of the language in his order of appeal as surplusage that did not limit or circumscribe the scope of appeal.

*Id.* at 578.

Ms. Candolfi's Notice of Appeal in this case contained similar language:

18

> Plaintiff/Appellant, Melissa Candolfi, appeals the decision in this case, pursuant to Maryland Rule 8-201(a), and in accordance with Maryland Rule 8-202(a), to the Court of Special Appeals.
>
> Respectfully submitted,
>
> Ryan T. West

And that's close enough, under *Hermina* and *Newman*, to bring the issue before us.

Turning to the substance of the direct civil contempt order, we appreciate the circuit court's frustration with counsel's absence on the hearing date, and we recognize the care the court took to track Rule 15-203 and develop the record on which it grounded its order. We are compelled nevertheless to reverse it, though, because (1) the order punished past, completed conduct rather than compelling future compliance and (2) the order lacked a valid purge provision. "'[T]his Court will not disturb a contempt order absent an abuse of discretion or a clearly erroneous finding of fact upon which the contempt was imposed.'" *Breona C. v. Rodney D.*, 253 Md. App. 67, 73 (2021) (*quoting Kowalcyzk v. Bresler*, 231 Md. App. 203, 209 (2016)). "A trial court abuses its discretion when its decision encompasses an error of law, which this court reviews without deference." *Id.* (citations omitted).

Mr. West's failure to appear at the May 20 hearing qualifies as direct contempt, and the court properly treated it as such. *Hermina*, 128 Md. App. at 587. Maryland Rule 15-203 defines the procedure for considering and imposing summary direct contempt:

> (a) Summary Imposition of Sanctions. The court against which a direct civil or criminal contempt has been committed may impose sanctions on the person who committed it summarily if (1) the presiding judge has personally seen, heard, or otherwise directly perceived the conduct constituting the contempt and

has personal knowledge of the identity of the person committing it, and (2) the contempt has interrupted the order of the court and interfered with the dignified conduct of the court's business. The court shall afford the alleged contemnor an opportunity, consistent with the circumstances then existing, to present exculpatory or mitigating information. . . .

(b) Order of Contempt. Either before sanctions are imposed, or promptly thereafter, the court shall issue a written order stating that a direct contempt has been committed and specifying:

(1) whether the contempt is civil or criminal,

(2) the evidentiary facts known to the court from the judge's own personal knowledge as to the conduct constituting the contempt, and as to any relevant evidentiary facts not so known, the basis of the court's findings,

(3) the sanction imposed for the contempt,

(4) in the case of civil contempt, how the contempt may be purged, and

(5) in the case of criminal contempt, (A) if the sanction is incarceration, a determinate term, and (B) any condition under which the sanction may be suspended, modified, revoked, or terminated.

As we noted in *Hermina*, "[t]he line between civil and criminal contempt is often indistinct; the same act may constitute both or at least embrace aspects of both." 128 Md. App. at 578 (*citing Tyler v. Balt. Cnty.*, 256 Md. 64 (1969)). The distinction arises in the court's objective: "the purpose of civil contempt is to coerce present or future compliance with a court order, whereas imposing a sanction for past misconduct is the function of criminal contempt." *Dodson v. Dodson*, 380 Md. 438, 448 (2004). And essential to a court's imposition of civil contempt is the person's ability to purge the contempt:

A civil contempt proceeding is intended to preserve and

> enforce the rights of private parties to a suit and to compel
> obedience to orders and decrees primarily made to benefit such
> parties. These proceedings are generally remedial in nature and
> are intended to coerce future compliance. Thus, a penalty in a
> civil contempt must provide for purging. On the other hand, the
> penalty imposed in a criminal contempt is punishment of past
> misconduct which may not necessarily be capable of remedy.
> Therefore, such a penalty does not require a purging provision
> but may be purely punitive.

*State v. Roll & Scholl*, 267 Md. 714, 728 (1973).

There are two problems with this order. *First*, the record reveals that the circuit court sought to punish Mr. West's past, completed conduct rather than to compel his future compliance with an order of the court. The court made no mention of seeking to preserve or enforce the rights of any parties or compel obedience of any of the court's orders. Based solely on Mr. West's failure to appear for the May 20 hearing, the trial court ordered him to "pay a sanction" to defense counsel. The court reiterated the point in its on-the-record findings:

> The Court has found Mr. Ryan West in contempt of Court, civil
> contempt, *based on his failure to appear, having been notified
> of this hearing, having been aware of this hearing, having told
> the Court in the filing that I struck that he will not appear, and
> that this Court will not take precedence.*

(Emphasis added.) The contempt finding here was grounded entirely in past, completed contempt—the summary judgment rulings terminated the case on the merits, and there were no future proceedings to attend. *See, e.g.*, *Breona C.*, 253 Md. App. at 76.

*Second*, there is no distinction between the sanction and the purge provision. The court's contempt order states that Mr. West "shall pay a sanction of $2,467.50 to Defense counsel to purge the contempt as compensation for Defense counsel's expenses incurred

in preparing for and attending the May 20, 2021 motions hearing in this case . . . .” But

*Breona C.* featured a similarly integrated sanction/purge provision that, as we explained

there, blurred the necessary distinction between the two purposes:

> to serve the coercive purpose of civil contempt, the sanction
> must be distinct from the purge provision and the valid legal
> requirement the court seeks to enforce. If the sanction imposed
> is a requirement to take the very action the court says will purge
> the contempt, then undertaking the purge action necessarily
> completes, rather than avoids, the sanction.

253 Md. App. at 74 (*citing Kowalcyzk*, 231 Md. App. at 211). “A lawful purge provision

affords the opportunity for exoneration” permitting the contemnor “to avoid the penalty by

some specific conduct that is within the defendant’s ability to perform.” *Id.* at 75 (*quoting*

*Kowalcyzk*, 231 Md. App. at 210, 209). Indeed, at the hearing, the court referred to them

interchangeably:

> Mr. West has been found in contempt. I am imposing
> summarily a sanction that could also be characterized as a
> purge provision. And Mr. West, as a result of his conduct, is
> responsible for attorney’s fees associated with [counsel for
> Allterra] as it relates to this particular hearing . . . . Mr. West
> will comply with that purge provision and/or sanction within
> 30 days of today’s date.

The court acted well within its discretion to find Mr. West in direct civil contempt, but the

absence of any distinction between its sanction and purge elements requires us to reverse

the contempt order.

**JUDGMENT OF THE CIRCUIT COURT
FOR WORCESTER COUNTY AFFIRMED
AS TO THE SUMMARY JUDGMENT
ORDER AND REVERSED AS TO THE
CONTEMPT ORDER. COSTS TO BE
DIVIDED EQUALLY.**